(Decided 25th June, 1885.)

---

THE STATE OF MARYLAND *vs.* STEWART BROWN and ARTHUR GEORGE BROWN, Trustees, &c., and THE ANNAPOLIS AND ELKRIDGE RAILROAD COMPANY. STEWART BROWN and ARTHUR GEORGE BROWN, Trustees, &c. *vs.* THE STATE OF MARYLAND, and THE ANNAPOLIS AND ELKRIDGE RAILROAD COMPANY.

*Res judicata—Deed of Trust—Power of Sale under a Deed of Trust in the nature of a Mortgage—Regularity of the proceedings under which the Deed was executed—Evidence—Practice—Acquisition by a Railroad Company, of stock in another Company—Amendment of Equity pleadings.*

Where every objection urged in the second suit was open to the party within the legitimate scope of the pleadings in the first suit, and might have been presented at that trial, the matter must be con-

State *vs.* Brown and Brown, Trustees, and A. & E. R. R. Co.

sidered as having passed *in rem judicatam*, and the former judgment in such a case is conclusive between the parties.

The principle of *res judicata* extends not only to the questions of fact and of law which were decided in the former suit, but also to the grounds of recovery or defence which might have been, but were not presented.

The decision binds the parties to the suit and those represented by them, and no other persons.

An incorporated railroad company in the year 1872, made a deed of trust to secure the payment of certain bonds issued by it. The deed provided that in case default was made in the payment of the principal of any of said bonds, or in the payment of the interest, under the circumstances therein referred to, it should be lawful for the trustees to sell and dispose of all the property and franchises of the railroad company. And it was made *their duty* to exercise the power of sale upon the requirement in writing of a majority in interest of the bondholders. Under proceedings for a sale instituted in the year 1884, it was HELD:

1st. That as the parties had by their own agreement provided for the contingency under which a sale might be made, the Courts must give effect to the power of sale thus given.

2nd. That in this respect the proceedings for a sale under said deed, differed from those in the case of a sale under a mortgage; and it would be contrary to the agreement of the parties as embodied in the deed of trust, to hold that the sale should be delayed until it was ascertained how many of the bonds were justly due.

3rd. That it was now too late to question the regularity of the election of the directors who ordered that the deed of trust should be executed.

4th. That the entries in the book of the proceedings of the company were not evidence against third persons.

While one railroad company may have the right to acquire the stock of another company, it has no right to use its controlling influence, thus acquired, with the directors of the latter company, so as to sacrifice the interest of that company.

Any conclusion formed by the Court upon evidence given on a motion to dissolve an injunction, can be used only at the hearing of that motion.

The amendment of the pleadings in an equity proceeding, is within the discretion of the Court, and no appeal lies from their decision.

APPEALS from the Circuit Court for Anne Arundel County, in Equity.

Two appeals have been taken in this case. The first was taken by the State of Maryland from an order of the Court below refusing its application for leave to file an amended bill. The original bill was filed in the year 1884. The second appeal was taken by the trustees from an order refusing their motion to dissolve the injunction, and continuing the same until the final hearing. The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, ROBINSON, RITCHIE, and BRYAN, J.

*Charles B. Roberts, Attorney-General,* for the State of Maryland.

*John Ireland,* and *Charles Marshall,* for the Annapolis and Elkridge Railroad Company.

*Stewart Brown,* and *S. Teackle Wallis,* for the trustees.

BRYAN, J., delivered the following opinion, in which Judge YELLOTT concurred :

We have heretofore decided a cause between the parties to this record. The State of Maryland filed a bill in equity, in which it was maintained that it had a lien on all the property and franchises of the Annapolis and Elkridge Railroad Company, and that said lien was prior to that created by the deed of trust in question, even if the deed were valid ; and it was further maintained by the State that the deed of trust was wholly invalid, or else was valid only to the extent of creating a lien for such of

the bonds secured by it, as were used for the particular purposes expressed in the first section of the Act of 1872, ch. 425. The prayer of the bill was for an injunction to restrain the trustees from making sale of all or any part of the property of the railroad, and alternatively to restrain them from making sale until they had ascertained by proper proceedings the parts or proportions of these bonds which had in fact been used for the purposes expressed in the first section of the Act of 1872. There were other prayers for relief adapted to the different aspects of the case. The defendants in the cause were the Annapolis and Elkridge Railroad Company, and the trustees, Stewart Brown and Arthur George Brown. The answer of the trustees controverted the case made by the bill, and maintained the validity of the deed of trust, and its priority to the rights and claims of the State. It also alleged that more than $150,000 of these bonds which had been duly issued, under and in accordance with the terms of the deed of trust, had been negotiated through Alexander Brown & Sons, and were outstanding in the hands of *bona fide* purchasers for value ; and that others of these bonds were outstanding in the hands of persons and corporations, who claimed to be *bona fide* holders for value. The cause was heard on bill and answer, and this Court decided upon the facts which were shown by the proceedings in the cause, that the deed of trust was valid, and that bonds to an amount exceeding $150,000 had been duly negotiated, and were outstanding in the hands of *bona fide* purchasers for value ; and that other bonds were in the hands of different persons, who alleged that they also were *bona fide* holders for value ; and that the State was not entitled to any of the relief prayed. The bill was therefore dismissed. This case is reported in 62 *Md.*, 439.

In the present case the bill is filed by the same complainant, and the same parties are defendants. It alleges ·

that the deed of trust is null and void ; as a consequence, it is maintained that all the bonds issued under its provisions were invalid, and that the trustees have no power of sale. Certain of the bonds amounting to $252,000 are specifically charged to have been issued and used in pursuance of a fraudulent agreement, and it is alleged that they are held by persons who had notice of the fraudulent character of the bonds at the time they received them. The relief prayed is, that the deed of trust may be declared null and void, and that the trustees may be restrained by injunction from making sale of any of the property of the railroad.

It is manifest that the relief sought in each of these cases is the same. The present bill repeats the allegations of the former one, and supports and fortifies them by other charges. The scope and objects of both bills is the same ; all of their averments tend to the same conclusion. The purpose in each case was to strike down, and defeat the power of sale contained in the deed of trust. It was entirely competent for the complainant to make in the first bill of complaint every allegation which was made in the second. It is not alleged that any of them were unknown at the time the first bill was filed ; and in point of fact, all of these additional allegations were contained in the petition for an injunction filed by the Annapolis and Elkridge Railroad in June, 1878 ; which petition was signed by the Attorney-General of the State, who appeared in the cause by order of the General Assembly of the State and the Board of Public Works. According to well-settled principles, our decision in the first case finally determined as between the parties to the suit, all matters then adjudicated. As between these parties, no matter then decided, can ever again become the subject of controversy. " Where every objection urged in the second suit was open to the party within the legitimate scope of the pleadings in the first suit, and might have been presented

in that trial, the matter must be considered as having passed *in rem judicatam*, and the former judgment in such a case is conclusive between the parties." *Aurora City v. West,* 7 *Wallace's Reports,* (*S. C.,*) 102. In a subsequent case in the same volume, the Supreme Court of the United States, speaking of the principle of *res judicata* say: "It extends not only to the questions of fact and of law, which were decided in the former suit, but also to the grounds of recovery or defence which might have been, but were not presented." *Beloit v. Morgan,* 7 *Wallace,* 622. And in the same case, the Court quotes with approbation the striking language of the Vice-Chancellor in *Henderson vs. Henderson,* 3 *Hare,* 115, as follows: "In trying this question, I believe I state the rule of the Court correctly, that where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction, the Court requires the parties to bring forward their whole case, and will not, except under special circumstances permit the same parties to open the same subject of litigation in respect of a matter which might have been brought forward as a part of the subject in contest, but which was not brought forward only because they have from negligence, inadvertence, or even accident, omitted a part of their case. The plea of *res judicata* applies, except in special cases, not only to the points upon which the Court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence might have brought forward at the time."

It appears to us therefore inevitable, that our decision in the former case must be conclusive between these parties, of every matter which then passed into judgment. We then determined that the deed of trust was valid; that bonds exceeding the amount of $150,000 were in the hands of *bona fide* holders for value; that default had

been made in the payment of the interest; and that the trustees had the power of sale in accordance with the terms of the deed of trust; and we accordingly denied the injunction. We trust that hereafter our opinion may not be misunderstood. Our decision binds the parties to this suit and those represented by them, and no other persons. We will in the course of this opinion make further explanation on this point. But we may now say that as this suit sought the general benefit of all the stockholders they are effectually bound by the result of it, and they cannot hereafter be heard to deny the right of the trustees to sell, in accordance with the terms of the deed of trust.

Our duty would not be fully discharged without considering some other questions discussed in this case. By the fourth article of the deed of trust, it is provided that in case default is made in the payment of the principal of any of these bonds, or in the payment of the interest under the circumstances therein referred to, it shall be lawful for the trustees to sell and dispose of all the property and franchises of the railroad company. And in the eighth article, it is made *their duty* to exercise the power of sale, upon the requirement in writing of a majority in interest of the bondholders. As the parties have by their own agreement provided for the contingency under which a sale may be made, the Courts must give effect to the power of sale thus given. In this respect the proceedings differ from those in the case of a sale under a mortgage. Where a bill is filed to foreclose a mortgage, the statute authorizes the Court to decree a sale unless the debt and costs are paid at or before the time fixed by the decree; and it is necessary for the Court to ascertain the amount of the debt, so that the defendant may know how much it is necessary for him to pay in order to prevent the sale. It would be contrary to the agreement of the parties as embodied in the deed of trust, to hold that the sale should be delayed until it was ascertained how many of the bonds

were justly due. Each bondholder holds his own separately and independently of all others ; and when his interest remains in arrear under the circumstances mentioned in the deed of trust, he ought not to be delayed by a controversy which should arise about the validity of the bonds held by other persons.

We are of opinion that the Drum Point Railroad Company had power to purchase stock in the Annapolis and Elkridge Railroad Company. *Booth vs. Robinson,* 55 *Md.,* 434. It is now too late to question the regularity of the election of the directors who ordered that the deed of trust should be executed. The deed was executed in June, 1872 ; and all parties interested had abundant means of knowing every detail connected with the transaction. No reason has been shown why so great a delay should have occurred in asserting any objections which they desired to urge against the deed. And in the meantime very valuable interests have vested on the faith of the deed. We must say, moreover, that the evidence in the cause shews that the election of the directors was not contrary to the charter of the company. The entries in the book of the proceedings of the company are not evidence against third persons. The efficient proof in the case is derived from the testimony of a witness who had personal knowledge of the transaction.

The sale of the shares of stock by Brown and Wells to the Drum Point Railroad Company was evidently for the purpose of giving to it the control of the Annapolis and Elkridge Company. It is unnecessary to comment upon this proceeding. The Drum Point Company had the right to acquire this stock, but it had no right to use its controlling influence in the Board of Directors so as to sacrifice the interest of the Annapolis and Elkridge R. R. Company. We think that the title which Wells and Brown acquired to the bonds issued to them, could not have been maintained against the stockholders of the Annapolis and Elk-

State *vs.* Brown and Brown, Trustees, and A. & E. R. R. Co.

ridge R. R. Company; nor could the title of the Drum Point Company have been maintained to the bonds which it acquired under the agreement in the record. We do not impeach the motives of the directors who authorized this disposition of the bonds. They were gentlemen of high character and responsibility; but we think that they fell into a very great error in this matter. Although the original title to these bonds was defective, yet such of them must be protected as are now in the hands of *bona fide* holders for value without notice of the objection to their validity. The evidence which we have been considering, was given on the motion to dissolve the injunction, and any conclusion formed upon it by the Court could be used only at the hearing of that motion; nevertheless for the purpose of diminishing as much as possible unnecessary litigation, we have thought it best to state our views on important questions which must arise hereafter in this controversy.

If the property of this railroad should be sold, when the proceeds are brought into Court for distribution, it will be competent for any party in interest to except to the claim of any bondholder. If the proceeds are not sufficient to pay all the bondholders, they may except to the claims of each other. The matters adjudicated in this case and the former one between the same parties, will not be available for or against the bondholders, except as establishing the right of the trustees to make the sale. The trustees represent the bondholders for this purpose; but not in the matter of distribution. After the sale the bondholders must stand on their own footing, and must maintain their own claims by evidence. Our finding that more than $150,000 of the bonds were in the hands of *bona fide* holders for value, established that fact conclusively in favor of the trustees, so as to enable them to make the sale, but will not be evidence for the bondholder when he claims distribution. On that issue it will be *res inter alios acta.*

State *vs.* Brown and Brown, Trustees, and A. & E. R. R. Co.

It is fully settled that bonds of this description are nego-tiable instruments, and are good in the hands of *bona fide* holders for value, without notice of any equities or defences against the first holders. The Supreme Court of the United States speaking of such bonds has said: "They are placed by numerous decisions of this Court on the foot-ing of negotiable paper. They are transferable by deliv-ery, and, when issued by competent authority, pass into the hands of a *bona fide* purchaser for value before matu-rity, freed from any infirmity in their origin. Whatever fraud the officers authorized to issue them may have com-mitted in disposing of them, or however entire may have been the failure of the consideration promised by parties receiving them, these circumstances will not affect the title of subsequent *bona fide* purchasers for value before matu-rity, or the liability of the municipalities (the makers of the bonds.) As with other negotiable paper, mere suspi-cion that there may be a defect of title in its holder, or knowledge of circumstances which would excite suspicion as to his title in the mind of a prudent man, is not suffi-cient to impair the title of the purchaser. That result will only follow where there has been bad faith on his part." *Cromwell vs. County of Sac*, 96 *U. S.*, 57. In the same case they say: "The simple fact that an instal-ment of interest is overdue and unpaid, disconnected from other facts, is not sufficient to affect the position of one taking the bonds and subsequent coupons before their ma-turity for value as a *bona fide* purchaser." *Vide* also, *Railway Company vs. Sprague*, 103 *U. S. Reports*, 756. We accept these decisions as conclusive of the questions involved in them.

It seems necessary to consider only one other question. We think that the amendment of the pleadings is within the discretion of the Court, and that no appeal lies from their decision. The appeal of the State must be dismissed. As the defence of *res adjudicata* must settle this contro-

versy at the final hearing, further litigation is needless. We will therefore reverse the order of the Circuit Court, and dismiss the bill.

*Order reversed, and*
*bill dismissed.*

(Decided 22nd July, 1885.)

STONE, J., delivered the following opinion :

The pressing question in this case is whether an injunction to prevent the sale of mortgaged property, should be continued because *a part* of the mortgage debt is in dispute, but *a part* is admitted, but no tender of the amount so admitted to be due is made. There are some other questions raised in this, and the case of *State vs. Brown, Trustee*, argued with it, but that is the question which, I think, is decisive upon the question of continuing the injunction.

There can be no doubt that if the whole of a mortgage debt is admitted or proved to be due and unpaid, a decree for the sale of the mortgaged premises follows as a matter of course. There can be as little doubt that if *the whole* of the mortgage debt is denied, a Court of equity will not permit the property to be sold until it is ascertained by proof what part, if any, of such debt is still due. But as soon as it is ascertained that any sum certain is due, then unless that sum is paid by a given day, the property will be ordered to be sold.

In the case at bar it is conceded that a part of the mortgage debt, that is the sum of one hundred and fifty-six thousand dollars, is undisputed and overdue, while the residue of the debt, secured by the deed of trust, is disputed and denied. But unless this hundred and fifty-six thousand dollars is actually tendered or brought into Court to be paid to the proper parties, I can see no escape from

14              v. 64.

the conclusion that the injunction must be dissolved and the railroad sold.

If the mortgaged property was capable of division, only so much thereof should be ordered to be sold as would be sufficient to pay the *undisputed* debt; but unfortunately the railroad cannot be sold in sections or parts, and the whole of it must necessarily go under the hammer to.pay this debt, unless the holders of it consent to wait, or unless the amount be brought into Court or tendered.

By the terms of the contract between these *bona fide* holders of the bonds and the railroad, it was stipulated and agreed, that if default in the payment of the interest on *any of the bonds* should continue for six months after demand, the principal should be due and payable, and the trustees have the right of entry and sale. By this stipulation the road must now abide, as far as these admitted bonds are concerned. There is nothing· in the contract looking to making one bondholder wait for another, but on the contrary each is left to pursue his remedy, if he so elects, without regard to his co-bondholder. The statement made on behalf of the road, that *if* the residue of its bonded debt, over and above this hundred and fifty-six thousand dollars, should be declared fraudulent or void, *then* it could pay that amount, is no sufficient answer to the claim for a decree for sale. There is no rule of equity or good conscience that requires one creditor to wait for another, when there is nothing in the contract that requires him to do so. To compel him to do so in a case like this, would in effect require this Court to add a new clause to the contract, and to change a clause already existing, as by the contract as it was made by the parties themselves, each bondholder had the express right to proceed to collect his debt upon default of his interest.

I recognize some hardship to the railroad itself, as well as to the bondholders whose claims are disputed, by this course of procedure. The hardship to the road consists in

State vs. Brown and Brown, Trustees, and A. & E. R. R. Co.

the fact, that if it was definitely ascertained that it was only liable for the hundred and fifty-six thousand dollars, it might make arrangements to settle that amount, and thus save its property from what may turn out a sacrifice. By the railroad I mean to include all its stockholders.

The hardship to the disputed bondholders consists in the fact, that being ignorant whether their claims will or will not be allowed, they will, in a measure, be precluded from appearing as bidders at the sale, and bidding enough to cover their claims as well as the undisputed ones, while the hardships we have mentioned are the necessary results of the contract the parties themselves made, and is beyond the power of this Court now to entirely obviate ; still I think we should indicate, as far as we can, our views as to the disputed claims, so that the parties holding them may be, in some measure, at least, guided by them.

The parties holding these disputed claims are not now before this Court, and of course their rights cannot be finally adjudicated until they are heard. They must of course be made parties before any final distribution of the proceeds of sale is made. But there is a portion of their case already before the Court on the records in these cases, and I think it nothing but right and proper to express an opinion as far as their case has gone.

It is no longer an open question in this Court, that any holder of any of these bonds for value, and who is unaffected by notice of the circumstances under which they were issued, is entitled to his money. The only question left to be determined, is whether those who were cognizant of the manner in which they were issued are so entitled? Or to state the question in another form, it is yet to be determined whether the making and issuing these bonds was an act fraudulent in law, and which would render them void in the hands of a holder with full notice of all the circumstances attending the issue of them. These

bonds were issued under the Act of 1872, ch. 425. The first section of that Act authorized the A. & E. R. R. Co. to extend its road down to the harbor of the City of Annapolis, or to any point adjacent thereto. The second section gave the company authority to borrow money and issue bonds, and to mortgage the road for the payment of them.

The second section of this Act is very general in its terms, and does not restrict the road to borrow only such sum as might be necessary to complete the improvement mentioned in the first section, but allows the borrowing of an unlimited amount, and for indefinite purposes. But the whole of an Act should be taken and construed together, and the most careful reading of the whole Act, would convey the impression that only the amount necessary to make the improvements mentioned in the first section, was contemplated to be raised under the second section. No stockholder of this road, would have been notified by the terms of this Act, that the money to be raised under it was to be applied to the building of another and distinct railroad, and owned by an entirely different corporation, or that the bonds were to be used for the purpose of enabling the Drum Point Road to buy up the Annapolis and Elkridge Railroad.

On the very day that the Act of 1872, ch. 425, became a law by the approval of the Governor, to wit, on the 1st of April, 1872, an agreement was signed between the Drum Point Road on the one part, and two gentlemen who owned a majority of the stock (other than the State's,) of the A. & E. Road, and who were directors in said road, and one, the president, which after reciting, that the A. & E. R. R. *needed repairs,* but that the company was unable to make them, and after further reciting the fact that the Drum Point Road *desired to purchase* the A. & E. Road, went on to agree that the two gentlemen above mentioned, would sell all their stock in the A. & E. Road

(which was a controlling interest) to the Drum Point Road for the sum of *one hundred thousand dollars,* and the said two gentlemen then owning enough of the stock of the A. & E. Road to control the directory, further agreed to procure *the resignation of the then existing Board of Directors and President of the A. & E. Railroad, and the appointment as their successors of persons selected by the Drum Point Road.*

The said two gentlemen for this service and sale were to receive one hundred thousand dollars, to be paid for as follows:—$1000 cash on that day;—$4000 on or before 10th April, 1872, and $45,000 on or before 10th May, 1872—the remaining $50,000 to be paid in the bonds of the A. & E. Railroad, authorized by the Act of 1872, and to be issued and delivered to said two gentlemen on or before the 1st of July, 1872.

It also appears that the fifty thousand dollars cash to be paid said two gentlemen was loaned to the Drum Point Railroad, by a certain Mr. Bareda, and whose only security for such loan was the bonds of the A. & E. Road hypothecated, or to be hypothecated to him to secure its payment, and which appears to have been done.

In order fully to appreciate and understand the agreement that we have mentioned, it must be borne in mind that the Drum Point Road existed only on paper, and that the A. & E. Road never had paid a dividend on its stock, but was comparatively an old road equipped, and running.

The agreement made by the sellers of the A. & E. R. R. stock, to procure the resignation of the then Board of Directors of the A. & E. Road, and the substitution of directors to be designated by the Drum Point Road, appears to have been promptly carried out. A special meeting of the Board was called by the President less than a month after 1st of April, 1872, to wit, on 25th of April, 1872, and at such special meeting, the whole Board of Directors

representing all the stock (except the State's) were requested by the gentlemen who had made the agreement, to resign, *and without exception they all did so then and there*, and their places were filled by nominees of the Drum Point Road.

This remarkable performance being over, the A. & E. Road proceeded under its new management to issue bonds under the Act of 1872, and subsequently in October, 1872, agreed with the Drum Point Road to advance it some of these bonds for the purpose of its construction.

It should be mentioned that under its new directory the President, Directors and Secretary of the A. & E. Road, were *the same persons* who filled the same offices in the Drum Point organization.

The agreement dated 29th October, 1872, by which the A. & E. Railroad agreed to advance its bonds to the Drum Point Road, was an agreement *signed by the same men* professing to act in the different capacities, of President and Secretary of the A. & E. Railroad, and President and Secretary of the Drum Point Road.

We add to this statement the fact, that about three hundred and fifty-eight thousand dollars of these bonds have been issued, but that not a rod of a branch from its present depot, to the *harbor of Annapolis*, has been built by the A. & E. Road, and not a rail laid on the Drum Point Road.

The State is the owner of *three thousand* shares of the A. & E. Railroad, and is represented by three directors, while the private stockholders, owning four hundred and seventy-two shares, are represented by six directors.

The conclusion from these facts seems to me to be irresistible, that the issue of these bonds was fraudulent and voidable against every stockholder of the A. & E. Railroad, except those who actually consented to such issue, and that they are void in the hands of every holder who took them with knowledge of the facts attending their issue.

The stockholders are the real owners of the A. & E. Railroad, and the president and directors are the agents of the stockholders. They were elected for a limited period, and the general duties of the directors are well-known. It could never have been contemplated by any stockholder, except those in the secret, that when in the fall of 1871 these directors were elected they were invested with the power and authority during their term of office to hand over the road to another corporation, whose end and aim was to cumber the A. & E. road with a debt to aid in building such other road. An agent may commit a fraud against his principal as well as against any one else, but no such agent, his aiders or abettors, or those who have knowledge of his fraud, will be permitted to reap any benefit from it.

I do not consider the State as standing upon any higher ground than any other *preferred stockholder.* She consented to the passage of the Act of 1872, and is therefore bound by its terms. This Act gave the A. & E. road power to issue bonds. This power was given unlimited in its terms by the second section of the Act. The first section of the same Act indicated in most unmistakable terms, the wants and purposes of the road. It gave the road the power to extend its track to the harbor of Annapolis, to build works, and purchase land and other material necessary for the construction of such tracks. Taking the whole Act together, and construing it as every other Act is construed, it authorized the directors to issue all bonds necessary to build and buy what was specified in the Act itself, *and nothing more.* But surely that Act did not intend, and did not authorize the directors of the A. & E. road to issue bonds to raise money to buy a controlling interest in its own stock, for the purpose of transferring such controlling interest to another corporation, and also to use such bonds for the purpose of building another and distinct road. Yet this was what was done by the directors of the A. & E. road, and if such action is not fraudulent and void

against the parties thereto, and those taking the bonds with knowledge of the manner and purpose of their issue, then I am at a loss to know what would constitute a fraudulent act on the part of a director in a railroad.

But the parties who in market overt bought these bonds for value, stand upon a different footing. Looking at the Act of 1872, and seeing that the directors had power to issue bonds, they were not required to examine further, and if there was an abuse of their trust by the directors, it could not affect them, and they are entitled to their money.

These questions, or some of them, will more properly arise after the sale is made, and when the proceeds are ready for distribution, and when all the parties in interest are properly before the Court. Still I think the principles upon which the distribution should be made, should be indicated as nearly as they can be, for the reasons that I have before stated.

I think therefore that the order continuing the injunction should be reversed, the injunction dissolved, and the bill dismissed.

I think the appeal in the case of *State vs. Brown* should be dismissed, as I think it was entirely in the discretion of the lower Court to allow or refuse the amendment asked for.

ALVEY, C. J., delivered the following opinion which was concurred in by Judges ROBINSON and RITCHIE:

I agree in the conclusion reached by the opinions of my Brothers BRYAN and STONE, that the injunction should be dissolved, and the bill be dismissed, but I do not think it proper to discuss and determine questions not necessarily involved, and which may be raised in the distribution of the proceeds of sale, if raised at all. Whatever questions may arise as to the validity of the bonds, or any part of them, will or may be properly disposed of in the distribution of the fund; and in this view of the case Judges ROBINSON and RITCHIE concur with me.