710 F.2d 620
 SPRINGFIELD TELEVISION OF UTAH, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
United Church of Christ, et al., Intervenors.
STORER BROADCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
South Central Broadcasting Corp., et al., Intervenors.
WEST VIRGINIA TELECASTING, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
United Church of Christ, et al., Intervenors.
ROY H. PARK BROADCASTING OF the TRI-CITIES, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
 Nos. 80-2028, 81-1475, 82-1874 and 82-1976.
 United States Court of Appeals,
Tenth Circuit.
 April 13, 1983.
Rehearing Denied June 13, 1983.
 
 Martin E. Firestone (Sanford, Adams, McCullough & Beard, Washington, D.C.), for petitioner Springfield Television of Utah, Inc. (Beverly D. Horn, Washington, D.C., with him on the briefs).
 Arthur B. Goodkind, Washington, D.C. (Koteen & Naftalin, Washington, D.C.), for petitioner Storer Broadcasting Co.
 Richard Bodorff, Washington, D.C. (Fisher, Wayland, Cooper & Leader, Washington, D.C.), for petitioner West Virginia Telecasting, Inc. (Grover C. Cooper and David D. Oxenford, Washington, D.C., with him on the briefs).
 Robert W. Coll and Carl R. Ramey, Washington, D.C. (McKenna, Wilkinson & Kittner, Washington, D.C.), on the brief for petitioner Roy H. Park Broadcasting of the Tri-Cities, Inc.
 John E. Ingle, Washington, D.C. (Counsel, F.C.C., Washington, D.C.), for respondent F.C.C. (Marjorie S. Reed, Daniel M. Armstrong, Nancy E. Stanley, and Lisa B. Margolis, F.C.C., Washington, D.C., and Robert B. Nicholson and George Edelstein, Dept. of Justice, Washington, D.C., with him on the brief).
 Leon T. Knauer, Washington, D.C. (Wilkinson, Cragun & Barker, Washington, D.C.), for intervenors Bonneville Intern. Corp., KUTV, Inc., United Television, Inc., Summit County, Ogden Valley TV Repeater Ass'n, Mantua City Corp., Clifton City Corp. and Mink Creek TV Corp. (Robert W. Barker and Kenneth D. Patrich, Washington, D.C., with him on the briefs).
 Robert A. Bernstein, Rockville, Md. (Bernstein & Longest, Rockville, Md.), for intervenors Chrysostom Corp. and Nat. UHF Broadcasters Ass'n (James L. Blair with him on the briefs).
 Edward S. O'Neill, Washington, D.C. (Bryan, Cave, McPheeters & McRoberts, Washington, D.C.), for intervenor South Central Broadcasting Corp. (William T. Carey, Washington, D.C., with him on the briefs).
 Earle K. Moore, New York City (Moore, Berson, Lifflander & Mewhinney, New York City), on the brief for intervenor United Church of Christ.
 Before McWILLIAMS, DOYLE and BREITENSTEIN, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 Four petitions seek review of actions by the Federal Communications Commission, FCC, in rulemaking proceedings. The first filed, No. 80-2028, was presented by Springfield Television of Utah with jurisdiction lying under 47 U.S.C. Sec. 402(a) and 28 U.S.C. Sec. 2343. No. 81-1475, Storer Broadcasting Company, No. 82-1874, West Virginia Telecasting, Inc., and No. 82-1976, Roy H. Park Broadcasting of the Tri-Cities, Inc., are all transfers, pursuant to 28 U.S.C. Sec. 2112(a), to the Tenth Circuit from other circuits. Petitioners attack the October 20, 1980, Report and Order of FCC in "Rule Making to Amend Table of Assignments to Add New VHF Stations," 81 FCC 2d 233, and the June 10, 1982, FCC Order denying reconsideration, 90 FCC 2d 160. These orders permit the allocation of new VHF television assignments to each of four cities: Salt Lake City, Utah; Johnstown, Pennsylvania; Charleston, West Virginia; and Knoxville, Tennessee. The petitioners attack the orders on various grounds, both general and specific. We deny all petitions for review.
 
 
 2
 Background.
 
 
 3
 The declared purpose of the 1934 Communications Act was to regulate "communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, ..." 47 U.S.C. Sec. 151. FCC was created to administer and enforce the Act, and was given broad rulemaking authority. 47 U.S.C. Sec. 303(r).
 
 
 4
 With the emergence of television as a broadcasting service, FCC adopted a Table of Assignments to permit an efficient use of the available spectrum, and to distribute channels fairly among states and communities. In 1952, FCC adopted its so-called "Sixth Report," 41 FCC 148, allocating channels to communities throughout the United States on both Very High Frequency, VHF, and Ultra High Frequency, UHF. The country was divided into three zones with station mileage separations varying from 155 to 220 miles to prevent or minimize interference. Field strength contours, designated Grade A and Grade B, define the quality of reception.
 
 
 5
 VHF stations are on channels 2 through 13 of a standard television set. UHF stations are on channels 14 through 83. VHF stations generally provide a better signal at a given level of power and antenna height. Under the Sixth Report rules, FCC does not accept a license application for a station at a given location unless the Table of Assignments lists the channel as available. A channel inserted in the Table is known as a "drop-in." Ordinarily a drop-in will not be permitted unless it conforms to the mileage separation requirements. If it does not conform, the drop-in is described as "short-spaced." A waiver of the separation requirement is necessary if a drop-in is short-spaced.
 
 
 6
 In the 1960's FCC considered and rejected proposals to add short-spaced stations in several major markets. At the time VHF had an advantage over UHF because of propagation characteristics and because most television sets did not receive UHF stations. In 1962, Congress authorized FCC to adopt rules requiring that all new television sets shipped in interstate commerce be capable of receiving UHF as well as VHF channels. See 47 U.S.C. Secs. 303(s) and 330. FCC decided to abandon drop-in proceedings and give UHF a chance to develop under the new legislation. 41 FCC 1119, 1124. FCC adopted what has become known as "UHF Impact Policy" which encouraged the development of UHF by limiting the intrusion of VHF into UHF service areas. See Eagle Broadcasting Company v. F.C.C., D.C.Cir., 514 F.2d 852, 854-855 (1975). The FCC relaxed the policy in WFMY Television Corp., 59 FCC 2d 1010, by saying that, regardless of the UHF impact, a VHF drop-in applicant could prevail by showing that the public interest favored the grant of the application. Id. at 1017.
 
 
 7
 Proceedings under Review.
 
 
 8
 In 1974, United Church of Christ, UCC, filed with FCC a Petition for Rulemaking specifically asking FCC to consider 62 new drop-ins. Joint Appendix (J.A.) 686, 688. The petition suggested that, where appropriate, the new channels be reserved for non-commercial television or applicants with substantial minority group ownership or management. Id. at 688-689. FCC found sufficient merit in the proposal to reopen the matter of drop-ins, and issued a Notice of Inquiry, 52 FCC 2d 618, 622-623. More than 100 parties filed comments, some supporting and some opposing the proposal.
 
 
 9
 In 1977, FCC issued its "Memorandum Opinion and Order and Notice of Proposed Rulemaking." 63 FCC 2d 840. By the application of various criteria, FCC reduced the 96 drop-ins proposed by UCC and others, to first 18 and then 10. Id. at 863-866. FCC analyzed the 10 markets and, as authorized by 47 U.S.C. Secs. 303(g) and (r) and 307(b), proposed to amend the Television Table of Assignments by the addition of new channels to the four areas here involved. Id. at 893. Interested parties were invited to file comments.
 
 
 10
 Many comments were filed in response to the Notice. After consideration of them, FCC concluded that its tentative evaluations were correct and approved, as in the public interest, the proposed amendments to the Table of Assignments and the proposed waivers of the mileage separation requirements, provided that licensees of the new channels afford equivalent protection to short-spaced stations. 81 FCC 2d at 234. FCC found that support of waiver had cleared the "high hurdle" that stands in the way of routine departures from FCC rules, Id., and that objectors on UHF impact grounds had not made a prima facie case of impact on any one of the four markets. Id. at 261-267. FCC examined specifically the four proposals and rejected the objections made to each.
 
 
 11
 Timely petitions for review were filed and consolidated in the Tenth Circuit. On FCC's motion, the proceedings were held in abeyance pending FCC action on petitions for agency reconsideration. 47 U.S.C. Sec. 405. After FCC denied those petitions, 90 FCC 2d 160, the abeyance order was vacated.
 
 
 12
 Scope of Judicial Review.
 
 
 13
 We are concerned with agency rulemaking after notice and opportunity to be heard. The Supreme Court has noted that "[t]he avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States." National Broadcasting Co. v. United States, 319 U.S. 190, 217, 63 S.Ct. 997, 1009, 87 L.Ed. 1344. The 1981 Supreme Court decision in FCC v. WNCN Listeners Guild, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521, presented the question of whether FCC must review changes in entertainment programming when ruling on applications to renew or transfer a broadcast license. The Court recognized, Id. at 594, 101 S.Ct. at 1274, FCC's "broad power to regulate in the public interest," and that its general rulemaking authority permits it "to implement its view of the public-interest standard of the Act 'so long as that view is based on consideration of permissible factors and is otherwise reasonable.' " The Court also recognized that FCC "decisions must sometimes rest on judgment and prediction rather than pure factual determinations." In such cases "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." Id. at 595, 101 S.Ct. at 1274, citing FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697.
 
 
 14
 The scope of judicial review of agency action is governed by the Administrative Procedures Act, 5 U.S.C. Sec. 706, as construed and applied in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-417, 91 S.Ct. 814, 822-824, 28 L.Ed.2d 136. Much has been written on the subject and we need not repeat what we said in American Petroleum Institute v. E.P.A., 10 Cir., 540 F.2d 1023, 1028-1029, cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601, and CF & I Steel Corp. v. Economic Development Administration, 10 Cir., 624 F.2d 136, 139.
 
 
 15
 The function of a court reviewing FCC decisions has been comprehensively considered in Telocator Network of America v. FCC, D.C.Cir., 691 F.2d 525, 537, and N.A.A.C.P. v. FCC, D.C.Cir., 682 F.2d 993, 997-999. Laying aside the many finely drawn semantic differences which tend to confuse rather than to clarify, a court has the responsibility of determining (1) agency authority, (2) agency compliance with prescribed procedures, and (3) claims that agency action is arbitrary, capricious, or an abuse of discretion. Resolution of (3) has proven the most difficult and controversial. The breadth and complexity of agency responsibilities require that it "be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties." Permian Basin Area Rate Cases, 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312. Said simply, the task of a reviewing court is to determine whether the record facts supporting agency action are adequately adduced and rationally applied. If they are, the court may not substitute its judgment for that of the agency. Overton Park, supra, 401 U.S. at 416, 91 S.Ct. at 823.
 
 
 16
 Petitioners attack the drop-in orders on both general and specific grounds. We first consider the general attacks and then each of the four specific drop-ins. FCC has broad rulemaking authority to carry out the duties and perform the responsibilities which Congress has delegated to it. 47 U.S.C. Sec. 303(r). FCC has used this authority to carry out the intent of Secs. 303(g) and 307(b), as well as the more general purposes of the Act. In this proceeding it has allotted four new frequencies, one each to a designated area. The allotment of frequencies involves technical and policy matters which Congress intended to leave to the broad discretion of FCC. See Nat. Ass'n of Regulatory Utility Com'rs v. FCC, D.C.Cir., 525 F.2d 630, 636. Because FCC had the power to make the allotments, our concern is with the exercise of that power.
 
 
 17
 In response to the FCC's notice of proposed rulemaking over one hundred parties, including two governmental agencies, filed comments. FCC had its staff and two private concerns make economic studies. 63 FCC 2d at 868-870. Because the drop-ins were short-spaced to existing stations, FCC had to waive its mileage separation requirements for VHF stations.
 
 
 18
 Burden of Proof.
 
 
 19
 Petitioners claim that FCC wrongfully shifted the burden of proof from those proposing the new allotments to those opposing them. The argument is that the proponent of a waiver faces a "high hurdle" which requires it to establish with particularity the facts and circumstances on which it relies. WAIT Radio v. FCC, D.C.Cir., 418 F.2d 1153, 1157, cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321. Burden of proof differs from burden of producing evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668. Whatever shift occurred in the instant proceedings related to the order of evidence, not the burden of proof. Although allotment of the four drop-ins requires waiver of spacing requirements, the overriding consideration is the public interest. FCC made an exhaustive analysis of costs versus benefits, market factors, and potential station interference. It considered all the 96 proposed drop-ins and approved only four. It took a "hard look," see WAIT, supra, 418 F.2d at 1156 n. 8 and 1160, at the record presented and concluded that the permitted drop-ins would promote national policy goals of greater programming diversity, presentation of divergent view-points, greater minority access to broadcasting, and increased competition. 81 FCC 2d at 253. A fair hearing was given to all interested in the proceedings. The type of action taken rests on prediction within the institutional competence of the FCC. FCC v. WNCN Listeners Guild, supra, 450 U.S. at 596, 101 S.Ct. at 1275. We reject the arguments based on burden of proof.
 
 
 20
 UHF Impact Policy.
 
 
 21
 Several petitioners and intervenor National UHF Broadcasters Association (NUBA) contend that the FCC action contravenes a congressional directive that FCC achieve UHF-VHF comparability. All parties recognize the disparity between UHF and VHF. From a technical standpoint UHF signal strength declines more rapidly with distance than does VHF signal strength and is more affected by terrain variations and high buildings. The economic result is that, because of the small UHF audiences, the networks and advertisers prefer VHF. See Improvements to UHF Television Reception, FCC Docket No. 78-391 as quoted in NUBA reply brief, p. 3. To aid UHF development FCC asked Congress to authorize it to require that all television sets moving in interstate commerce be capable of receiving all channels, both UHF and VHF, assigned to television use. In 1962, Congress responded by adopting the All Channel Receiver legislation, now codified as 47 U.S.C. Secs. 303(s) and 330. The objective was "an intermixed television system using both 12 VHF and 70 UHF channels." S.Rep. No. 1526, 87th Cong., 2d Sess. 7 (1962), reprinted in 1962 U.S.Code Cong. & Ad.News 1873, 1879. We find nothing in the 1962 Act requiring FCC to correct the competitive inequalities between UHF and VHF or to foreclose it from changing the Table of Assignments.
 
 
 22
 NUBA supports its claim of a congressional mandate by referring to S.Rep. No. 95-1043, 95th Cong., 2d Sess. (1978). That Report of the Senate Appropriations Committee includes the following, Id. at p. 71:
 
 
 23
 "UHF television broadcasting remains sorely disadvantaged within the national television system. The Committee directs that the Commission devise a plan for UHF to reach comparability with VHF in as short a time as practicable, .... This plan should address all the technical and regulatory aspects of achieving parity and should set a schedule for dealing with each including dates for achieving specific goals, such as noise-level reductions. It should also include indications of the probable need for any legislation necessary to fulfill the plan."
 
 
 24
 The NUBA arguments are not persuasive. The 1962 Act authorizes, but does not require, FCC to adopt rules relative to the interstate shipment of television receivers not capable of accepting all VHF and UHF channels. For a discussion of the 1962 Act and its legislative history, see Electronic Industries Ass'n Consumer v. FCC, D.C.Cir., 636 F.2d 689, 694-696. Congress wanted to improve UHF service to make it competitive with VHF and left to FCC the task of attaining that goal. Id. at 695.
 
 
 25
 The 1978 Report of the Senate Appropriations Committee is noteworthy but is a "hazardous basis" for inferring the meaning of the 1962 Act. Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766. The recommendations called for FCC to devise a plan but were not adopted by Congress. At most the petitioners and intervenors show a congressional committee's desire to foster the growth of UHF, leaving the implementation of that policy to FCC for consideration of the technical and economic problems involved.
 
 
 26
 Several opponents to the order permitting the four drop-ins argue that the action radically departed from the FCC policy of protecting UHF television and that the departure was without adequate basis or corresponding benefit. In its 1980 Report and Order, FCC considered UHF impact policy at length. See paragraphs 18-38, 81 FCC 2d at 240-248. FCC said, Id. at 244, p 29:
 
 
 27
 "The history of the 'UHF Impact' issue demonstrates that since the All Channel Receiver law, the Commission has increasingly moved away from any automatic assumption of harm in favor of UHF television. The trend has been towards balancing the diversity gained from additional VHF service against the potential harm to UHF television, with harm to UHF becoming less of a factor as time progressed and the service matured. Several factors today lead us to believe that UHF television is, generally, in a much stronger position than it was in 1976, enabling it to withstand an even greater amount of competition than at the time of the WFMY, Inc. decision."
 
 
 28
 In p 37 FCC notes the "highly speculative character" of UHF impact, and in p 38 comments that "even our best predictions are unable to calculate marketplace behavior to the degree we would wish." Id. at 247.
 
 
 29
 The 1982 FCC Order denying reconsideration again discussed UHF impact. Paragraphs 19 and 20, 90 FCC 2d at 169. In rejecting the contentions that it had changed its policy, FCC said, Id.:
 
 
 30
 "Our determination in this case did not occur as a result of an abandonment of a longstanding Commission policy. Our decision was no more than a continuation of a line of cases that have accorded UHF television less and less protection as it became more and more competitive. [Footnote omitted.] In the instant proceeding we concluded that the inauguration of addition [sic] VHF television service in the affected communities outweighed the potential adverse impact on existing and potential UHF service."
 
 
 31
 FCC then considered and rejected arguments relating to UHF impact on individual drop-ins.
 
 
 32
 The FCC action under review was forecast by its 1976 decision in WFMY Television Corp., 59 FCC 2d 1010, 1017:
 
 
 33
 "... regardless of the characterization of the impact on UHF, the VHF applicant should be permitted to demonstrate by countervailing evidence that, overall, the weight of the public interest favors a grant of the application. This may be done by any of the criteria which we have traditionally considered in allocations-related matters."
 
 
 34
 The record discloses a growing policy complicated with both technical and economic problems. The controlling factor is, and should be, the public interest. In determining the public interest FCC gave consideration to the criteria mentioned in the WFMY decision. Id. We turn to other factors affecting each of the four drop-ins.
 
 
 35
 Increased Interference.
 
 
 36
 The 1980 FCC Order allowing the drop-ins says that applicants for construction permits must include a showing of "equivalent protection" demonstrated in accordance with existing procedures. 81 FCC 2d at 272. The Order discusses interference in detail. Id. at 254-257. FCC recognized that some interference will exist and said that the extent can only be foretold by estimates and predictions. Id. Noise limitation because of atmospheric and man-made conditions, interference limitation because of station location and capacity of receiving antennas, and access to program services were all discussed. FCC said, Id. at 255-256:
 
 
 37
 "... we are confident that the four subject VHF allotments will result in new local service of far greater value than the potential reduction in signal quality attributable to co-channel interference."
 
 
 38
 We conclude that FCC acted reasonably on adequate evidence.
 
 
 39
 Terrain.
 
 
 40
 FCC commented that the record on terrain shielding "is not sufficient to provide a basis for drawing conclusions regarding the four specific drop-in proposals." Id. at 257. Computer studies were rejected because of "obvious errors." FCC concluded, Id., that: "we find the procedures set out in our rules a more reliable allocation tool and will not, as has been our previous practice, consider terrain factors in predicting interference." We accept the FCC explanation of departure from previous practice.
 
 
 41
 Translator Disruption.
 
 
 42
 Translators serve local communities by receiving a signal, amplifying the power and often changing the frequency. FCC noted that translators provide a "secondary" service and "are required to accept harmful interference from primary users of spectrum." Id. at 258. It concluded that: "the effect of any possible disruption of translator service, in terms of people served, is more than offset by the gain in service realized by the drop-ins." Id. FCC also noted the problem of costs of translator changes and continued its past practice "of not imposing translator change costs upon those to whom the translators will interfere with." Id. We accept the FCC expertise.
 
 
 43
 Protection of Future Facilities.
 
 
 44
 FCC rejected the contention that the new drop-ins provide protection if present licensees decide to increase or change existing facilities in the future. Id. at 258-259. It said, Id. at 259:
 
 
 45
 "Placing unnecessary service-limiting conditions on the grant of these already short-spaced allotments based upon a purely speculative contingency is inconsistent with our desire to maximize the provision of new service and encourage spectrum efficiency."
 
 
 46
 It is also noted that subsequent stations will be required to give equivalent protection to the four new drop-ins. Id. We believe that the FCC action is reasonable and must control.
 
 
 47
 On all of the above-mentioned matters, FCC has thoroughly explored, and carefully analyzed, the pertinent facts. It "has been diligent to take a hard look at the problem areas, and to set forth with clarity grounds of reasoned decision." Greater Boston Television Corp. v. FCC, D.C.Cir., 444 F.2d 841, 852-853, cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701. Determination of where the public interest lies involves prediction and that prediction has been reasonably explained. We will not reject the FCC expertise and substitute our judgment. We turn to matters pertaining particularly to the authorized drop-ins.
 
 
 48
 Salt Lake City, Utah.
 
 
 49
 FCC amended the Table of Assignments by allotting VHF Channel 13 to Salt Lake City, Utah. Springfield Television of Utah, Springfield, petitioner in No. 80-2028, owns and operates a television station in Salt Lake City licensed to use UHF Channel 20. Petitioner and intervenors Bonneville International Corporation, KUTV, et al., and Chrysostom Corporation object to the Salt Lake City drop-in.
 
 
 50
 The focus of Springfield's argument is that FCC in its Notice of Rulemaking set forth criteria for selection of drop-ins and then ignored them with respect to Salt Lake City. The 1977 Notice contained this statement, 63 FCC 2d at 861:
 
 
 51
 "A drop-in, however, which has the potential to offer a new service to a significant population, where it appears improbable that a UHF station could offer that service within the next ten years, is a subject for study by this Commission, in the interest of serving the public." [Emphasis supplied.]
 
 
 52
 The Springfield construction permit was granted on March 15, 1978, and the station began operation on October 24, 1978. Springfield Brief at 16, n. 17.
 
 
 53
 Springfield contends that FCC acted arbitrarily in not applying a criterion which it established. The record shows that FCC recognized the existence of the Springfield station. The 1980 Order says, 81 FCC 2d at 263:
 
 
 54
 "With regard to claimed UHF impact, comments filed by Springfield Television of Utah, Inc., licensee of a new UHF station which went on the air in Salt Lake City in 1978. This station, while alleging some hardship from a VHF drop-in, primarily asserts only critical harm to future Salt Lake City UHF prospects. It has submitted no factual data of specific impact suggestins [sic] its demise or serious injury that should result in a loss of service." [Emphasis in original.]
 
 
 55
 Springfield moved to defer the time for comments under the notice or, in the alternative, to modify the notice. J.A. 345. FCC denied the motion but treated it as a comment by Springfield. J.A. 152. Springfield filed other comments. See J.A. 355 and 367. Those comments, and others filed by intervenors, attack the econometric studies of the FCC and its rejection of claims of interference with translators. The studies included cost-benefit, market, and local analyses. With regard to the Salt Lake City drop-in, FCC found that over 800,000 viewers would gain service. The use of the econometric studies is peculiarly within the expertise of FCC. Springfield and the intervenors say that 114,000 or more viewers will lose service.
 
 
 56
 Without translators, many rural areas in Utah and adjoining states would be without television service. The number of translators potentially affected by the drop-in is variously estimated at 19 to 59. The translators, for the most part, are locally owned, either publicly or privately. The cost of converting the translators to avoid interference with the drop-in is estimated to be over $500,000, beyond the payment ability of the local operators. The translators are needed because of the mountainous terrain of Utah and surrounding states.
 
 
 57
 We have noted that FCC rejected terrain shielding on technical grounds and we accept its expertise. We have also noted that FCC treats translators as providing a secondary service which is subject to interference by primary spectrum users. Harm to the rural viewers must be balanced against benefit to the urban viewers to determine where the public interest lies. The purpose of the Communications Act is to make radio communication available to all the people of the United States so far as possible. 47 U.S.C. Sec. 151. Congress has delegated to FCC the determination of the public interest. After giving full opportunity for comments and making its own studies, FCC concluded, 63 FCC 2d at 888, that:
 
 
 58
 "Weighing the potential benefit of an independent commercial station, as a viewing choice for a substantial population, against the translator impact and potential for future inference, we conclude that net positive benefits could be derived from this proposal and it should be accorded further study in rulemaking."We accept the FCC determination that the addition of the Salt Lake City drop-in was in the public interest.
 
 
 59
 Intervenor Chrysostom Corp., licensee of Channel 13 in Rock Springs, Wyoming, attacks the Salt Lake City drop-in from another perspective. It contends that the drop-in will prevent it from relocating its transmitter and expanding its service. The drop-in decision does not preclude Chrysostom from moving or expanding its facilities. The FCC order provides that an existing station will have to provide equivalent protection to the drop-in if it chooses to move closer to the drop-in or enhance its facilities in a way that would cause interference. In 1981 Chrysostom applied for authority to move its transmitter to a higher location in the direction of the Salt Lake City drop-in and FCC denied the application. In effect Chrysostom seeks to have this court review FCC's denial of its application. We cannot do so in this rulemaking proceeding. Section 402(b), 47 U.S.C., vests exclusive jurisdiction in the D.C. Circuit to review applications for license modification. See Hubbard Broadcasting, Inc. v. FCC, 8 Cir., 684 F.2d 594, 596-597.
 
 
 60
 In allowing the Salt Lake City drop-in, FCC acted reasonably on an adequate record.
 
 
 61
 Johnstown, Pennsylvania.
 
 
 62
 Storer Broadcasting Company, petitioner in No. 81-1475, is licensee of Channel 8, WKJW, in Cleveland, Ohio. The proposed Johnstown, Pennsylvania, drop-in would be short-spaced to WKJW.
 
 
 63
 In the 1977 Notice, FCC considered the addition of a Channel 12 drop-in in Altoona, Pennsylvania, approximately 30 miles northeast of Johnstown. FCC noted that Johnstown and Altoona are considered "part of the same television market." 63 FCC 2d at 877. The Notice primarily discussed the impact of the Channel 12 drop-in in Altoona. With respect to the Johnstown Channel 8 drop-in, FCC said that because the Channel 12 drop-in theoretically will not provide interference-free service to Johnstown "comments will be sought on alternative transmitter sites," 63 FCC 2d at 879. FCC further said that because of the possibility that the Channel 8 drop-in might provide greater benefits than Channel 12, "[w]e shall propose Channel 12 and Channel 8 as alternatives to serve the Johnstown-Altoona market." Id.
 
 
 64
 In deciding on the Johnstown drop-in, FCC gave these reasons, 81 FCC 2d at 263, n. 66: Johnstown would serve more people, 1,494,800 compared to 595,500 and have greater net benefits; Altoona would be short-spaced to four stations; Altoona would present a difficult offset problem with Richmond Channel 12; and the absence of support for the Altoona drop-in.
 
 
 65
 With respect to the gains and losses resulting from the Johnstown drop-in, FCC found, Id. at 263:
 
 
 66
 "With respect to Johnstown Channel 8 ... the [1977] Notice gave no data. [Footnote omitted.] Using the same methods, however, for compiling similar figures stated by the Commission in the [1977] Notice, we found the interference-free Grade B contour population served by a Channel 8 Johnstown allotment to be 1,494,800. We found total interference to the various affected stations to be 738,262 distributed as follows: (a) co-channel station WGAL, Lancaster, Pennsylvania--111,653, (b) co-channel station WKJW-TV, Cleveland, Ohio--360,000 and, (c) adjacent channel stations WTRF and WSTV, Steubenville, Ohio--Wheeling, West Virginia--266,036."
 
 
 67
 As to the Storer station WKJW at Cleveland, FCC concluded, Id. at 265, that "whatever interference there may be is more than offset by the gains to Johnstown," and that "with regard to Cleveland, all persons live in a county where there is an available off-the-air alternative like-program source [presumably cable television]." Id.
 
 
 68
 A number of the parties, but not Storer, filed petitions for reconsideration of the Johnstown drop-in, relying chiefly on interference claims. FCC noted that such claims had already been considered and that rehearing is not generally available for reargument of matters considered and denied. 90 FCC 2d at 172. With regard to interference, FCC concluded, Id., that:
 
 
 69
 "Suffice it to say that any station operating on Channel 8 at Johnstown will have to provide protection to these [existing] stations that would be the equivalent of the protection which would be provided by a full-spaced station. Stations are entitled to no more protection than that."
 
 
 70
 In its petition for review Storer says that FCC relied on a secret staff study in making its estimates and that the parties were denied the opportunity to comment on the FCC figures. In this court Storer and FCC exchange charges and counter charges based on claimed procedural defects. The determinative question is whether, in allowing the Johnstown drop-in, FCC acted reasonably in the public interest on an adequate record.
 
 
 71
 Storer argues that FCC acted arbitrarily and capriciously by ignoring certain "decisional standards" set out in the 1977 Notice. With some factual justification, Storer argues that FCC ignored or violated some of the criteria. We are convinced that the criteria found in the Notice were not absolute requirements but rather preliminary considerations intended to reduce the large number of proposed drop-ins to a manageable quantity for further study. 63 FCC 2d at 862, 865.
 
 
 72
 FCC said, and Storer recognizes, Br. at p. 13, that the major consideration in each case is cost-benefit, i.e., that service gains provided by any new drop-in exceed the cost in terms of service lost or impaired. The fact that the Johnstown drop-in did not satisfy some of the preliminary selection criteria has no significance.
 
 
 73
 Storer also complains that FCC acted wrongfully in basing its decision on a staff study which did not become a part of the record until after the 1980 decision had been made. In the Notice Johnstown was mentioned as an alternative to the Altoona site. In its 1982 Order FCC said with regard to the study to which Storer objects, 90 FCC 2d at 180: "The Johnstown material was not placed in the docket at that time because the material was not yet in existence when the Notice was adopted."
 
 
 74
 FCC then noted studies submitted by the Group for Advancement of Television Service and the Institute for Telecommunications Sciences of the Department of Commerce, and said, Id. at 180-181:
 
 
 75
 "Additionally, the Commission independently studied the situation in accord [sic] with the methodology described in detail in paragraphs 92-98 of the Notice. As a result of a review of all of the studies filed and its own study, the Commission concluded in the Report and Order that its own study was correct and that service gains in excess of the losses would result from the allotment of Channel 8 to Johnstown."
 
 
 76
 In some circumstances failure of an agency to disclose pertinent data in a rulemaking proceeding may warrant reversal. See Portland Cement Ass'n v. Ruckelshaus, D.C.Cir., 486 F.2d 375, 393, cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226. We do not consider the failure of FCC to make the staff study available for comment a critical error. In its 1977 Notice FCC disclosed the methodology which it would apply and the 1980 Report and Order says that FCC had "us[ed] the same methods" stated in the Notice. 81 FCC 2d at 263. Storer was aware of the methodology. Instead of petitioning FCC for reconsideration to afford an opportunity for review of the staff study, Storer waited to submit the issue in its petition for court review. Reconsideration is the proper vehicle to obtain FCC correction of errors. See Action for Children's T.V. v. FCC, D.C.Cir., 564 F.2d 458, 468-469. We are convinced that FCC did not act arbitrarily or capriciously in allowing the Johnstown drop-in.
 
 
 77
 Charleston, West Virginia.
 
 
 78
 The FCC orders allotted Channel 11 as a drop-in at Charleston, West Virginia. That action is attacked by West Virginia Telecasting, Inc., WVT, petitioner in No. 82-1874 and by Roy H. Park Broadcasting of the Tri-Cities, Inc., petitioner in No. 82-1976. WVT, the licensee of Channel 23, a UHF station in Charleston, commenced operations on September 19, 1982. WVT brief at p. 18. Park is the licensee of Channel 11 in Johnson City, Tennessee.
 
 
 79
 Petitioner WVT was not incorporated until after the period in which comments were to be filed and did not participate in that phase of the proceedings. Other interested persons and groups filed comments based on greater than predicted technical interference and negative UHF impact. Reservation of the drop-in for non-commercial purposes was also mentioned.
 
 
 80
 We discussed the appearance of an unanticipated UHF station in the drop-in market during our consideration of the Salt Lake City drop-in. Existence of a UHF station contrary to predictions is not a fatal defect. The criterion in the 1977 Notice, that there be no viable UHF station in the market within ten years, was a preliminary consideration designed to reduce the number of markets under scrutiny. The ultimate decision rests on a cost-benefit analysis.
 
 
 81
 WVT petitioned for partial reconsideration of the 1980 Order and supported its position with a study by a communication expert, Dr. Alan Pearce. He concluded that the operator of Channel 23 would incur heavy losses as a result of the drop-in and probably could not survive.
 
 
 82
 FCC considered the Pearce study in its 1982 Order denying reconsideration and rejected it for three reasons, only one of which merits discussion. With regard to the claim of projected loss, it said that in its experience start-up losses may be incurred by a station which later becomes viable and concluded, 90 FCC 2d at 178:
 
 
 83
 "... even if Dr. Pearce's figures are correct a conclusion that the UHF independent must fail if given additional commercial VHF competition is speculative."
 
 
 84
 Park attacks the Charleston drop-in on the ground of interference with its Channel 11 station in Johnson City, Tennessee, approximately 155 miles south of Charleston. The stations would be short-spaced by about 15 miles. The Park engineering study details interference within both the A and B contours. In rejecting the interference claims, 81 FCC 2d at 256, FCC considered "access to like-program source" and other matters. FCC estimated that 834,200 people would gain service by the drop-in and 249,865 would receive interference. Of those receiving interference only 1,754 lived in areas receiving "no alternative, like-program source." 63 FCC 2d at 871-872.
 
 
 85
 Both WVT and Park argue that FCC did not follow the criteria established by WFMY, supra, 59 FCC 2d at 1017. We are not persuaded. "The Commission offered a rational explanation for its policy founded on a predictive judgment well within its authority." Malrite T.V. of New York v. FCC, 2 Cir., 652 F.2d 1140, 1149, cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295.
 
 
 86
 Other arguments of WVT and Park go to general attacks on matters pertaining to all of the drop-ins. The action of FCC in allowing the Charleston drop-in was not arbitrary or capricious.
 
 
 87
 Knoxville, Tennessee.
 
 
 88
 Intervenor South Central Broadcasting Corporation attacks the Knoxville Channel 8 drop-in. South Central is the licensee of UHF station WTVK in Knoxville. The station has operated since 1953. Before 1979 it was the area's ABC network affiliate and is currently a NBC affiliate.
 
 
 89
 South Central raises two procedural arguments. It says that waiver of the separation rule is improper because no one filed a waiver request for Knoxville. The answers are that FCC may act sua sponte on a waiver, WAIT Radio v. FCC, supra, 418 F.2d at 1157, and that UCC's request for rulemaking in effect sought a waiver for Knoxville. J.A. 712. Also South Central had for some time sought to secure the Knoxville Channel 8 drop-in and requested a license modification to permit it to operate on that frequency. The request was renewed in 1974 and FCC merged it with the rulemaking proceedings now under review. 52 FCC 2d at 621. In its 1982 Order denying reconsideration FCC noted and rejected the modification request. South Central says that FCC erred because 47 C.F.R. Sec. 1.407 mandates separate consideration of a modification request and prevents joinder of a modification request with one for rulemaking. Although no express authority exists for merging the petitions, the general regulation is written to track 5 U.S.C. Sec. 553 and omits administrative details. In the circumstances, FCC did not abuse its discretion in merging the petitions.
 
 
 90
 South Central also contends that in rejecting its modification request FCC retroactively applied a changed standard. It says that at the time of its 1974 application FCC followed the policy of reallocating channels within a community by modification of existing licenses without consideration of competing applications. The policy is said to have been changed by the 1976 Order in Cheyenne, Wyoming, 62 FCC 2d 63. The Cheyenne decision is consistent with Ashbacker Radio Co. v. FCC, 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108, which holds that where two mutually exclusive applications for a channel are presented, FCC must hold a hearing before awarding a license. The underlying consideration is the public interest. Without a hearing at which the competing applications are analyzed, FCC cannot determine which applicant will best serve the public interest. 62 FCC 2d at 67. See also Community Broadcasting Co. v. FCC, D.C.Cir., 274 F.2d 753, 759.
 
 
 91
 South Central says that the Knoxville drop-in differs significantly from the other allowed drop-ins because of greater interference with other stations. In its 1980 Order approving the Knoxville drop-in FCC recognized that "interference will be caused to 45,265 persons who have no access to an alternative like-program source." 81 FCC 2d at 266. This figure is comparable to 1,754 for Charleston, Id. at 261, 2,500 for Johnstown, Id. at 265, and none at Salt Lake City, Id. at 263.
 
 
 92
 The FCC recognized the disparity, applied its balancing test, and found that the benefits, service to over one million people, 63 FCC 2d at 882, exceeded the costs and detriments. FCC was aware of the problems and considered in detail the factors and comments. Its policy decision was neither arbitrary nor capricious.
 
 
 93
 FCC commented on the South Central claim of serious adverse impact on its UHF station because of loss of network affiliation and VHF competition, which might cause the closing of the station or great financial loss. In considering and rejecting these claims FCC noted South Central's failure to furnish data bearing on its financial condition and concluded that the claim of financial disaster was unsupported. 90 FCC 2d at 174. The action of FCC was reasonable and within its discretion.
 
 
 94
 Conclusions.
 
 
 95
 As mandated by Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 823, we have made a "searching and careful" review of the record. FCC followed a rational path from record to decision, Burlington Truck Lines v. United States, 371 U.S. 156, 158, 83 S.Ct. 239, 241, 9 L.Ed.2d 207, and articulated "a rational connection between the facts found and the choice made," Curtis, Inc. v. ICC, 10 Cir., 662 F.2d 680, 685. The petitions for review are severally denied and the FCC orders are severally affirmed.