**CF&I STEEL CORPORATION, a Colorado Corporation, Appellant,**

v.

**ECONOMIC DEVELOPMENT ADMINISTRATION, et al., Appellees.**

No. 80–1180.

United States Court of Appeals, Tenth Circuit.

Argued May 5, 1980.

Decided June 20, 1980.

David W. Furgason, Denver, Colo. (William C. Robb of Welborn, Dufford, Cook & Brown, Denver, Colo., Arthur T. Downey, Washington, D. C., Michael E. Robinson, Dallas, Tex., of Sutherland, Asbill & Brennan, Washington, D. C., and Paul R. Hundt, New York City, on briefs), for appellant.

Joseph L. Bianculli, Washington, D. C., and David J. Armstrong, Pittsburgh, Pa. (Alice Daniel, Asst. Atty. Gen.; Anthony J. Steinmeyer, Robert S. Greenspan, Attys., U. S. Dept. of Justice; Robert S. Fastov, Asst. Chief Counsel, Economic Development Administration, U. S. Dept. of Commerce, Washington, D. C., on brief), for Federal appellees.

Charles W. Kenrick, Susan K. Wright, of Dickie, McCamey & Chilcote, Pittsburgh, Pa., John S. Pfeiffer, Robert J. Kapelke of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for appellee Wheeling Pittsburgh Steel Corp.

Before McKAY, BREITENSTEIN and LOGAN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This appeal attacks the dismissal of a declaratory judgment action which claimed violation of the Public Works and Economic Development Act of 1965, PWEDA, 42 U.S.C. § 3121 et seq., of regulations implementing that Act, 13 C.F.R., Part 301 et seq., and of the Steel Industry Lending Guidelines, 43 Fed.Reg. 16360. We affirm.

Plaintiff-appellant, CF&I Steel Corporation, operates a steel mill in Pueblo, Colorado. Defendant-appellee, Economic Development Administration, EDA, is an agency of the United States Department of Commerce. Other defendants-appellees are various federal officials, and Wheeling-Pittsburgh Steel Corporation, W–P. On August 27, 1979, EDA approved a $63.5 million loan guarantee for W–P to finance the construction of a steel mill at Monessen, Pennsylvania. CF&I then filed its complaint attacking the agency action. The district court expedited the trial. CF&I claims that it was denied meaningful discovery. The case was tried on a 10,243 page administrative record, a rejected offer of proof, the testimony of several witnesses, one deposition, numerous exhibits, and arguments. At the conclusion of the trial the court made oral findings and legal conclusions which were later presented in written form and signed. The court summarized its decision thus:

"The decision of the Administrative agency is supported, and the result is supported, and the result is one a reasonable, rational mind could reach. I do not deny that the opposite conclusions could be reached, if other evidence in the record were relied on, but the Economic Development Administration decided which evidence it would found its decision on. I am bound by that decision."

PWEDA was enacted to give financial assistance to areas of unemployment and underemployment. The legislative history is found at 1965 U.S.Cong. & Admin. News, 2788. A study of the steel industry produced a Report to the President—A Comprehensive Program for the Steel Industry, December 6, 1977 (federal defendants' Ex. A). The report concluded that federal funds were needed to assist steel companies, and could be provided under PWEDA through the EDA. The Steel Industry Lending Guidelines were published in April, 1978, as part of the business development program. 43 Fed.Reg. 16360.

W–P, the eighth largest steel producer in the United States, employs over 14,500 workers in Pennsylvania, Ohio, and West Virginia. It makes various steel products used in automotive, appliance, construction, energy, and container industries. Its earnings have fluctuated considerably. In 1977 W–P sought from EDA loan guarantee assistance for construction of a rail mill to diversify its product mix.

A suit by the Environmental Protection Agency against W–P was settled by a consent decree which required W–P to provide pollution control equipment and to pay $4 million in penalties. The consent decree, signed March 19, 1979, was conditioned on W–P's ability to obtain a federal loan guarantee.

The trial court determined in its Finding of Facts, ¶ 67, that:

"The EDA loan guarantee assistance for pollution control equipment and facilities and for the rail mill is part of a total EDA 'project' of $141.5 million, computed as follows:

Rail Mill  (Monessen)

(millions)

| EDA guaranteed loan | $ 63.5 |
|---|---|
| PIDA (MIDA) Loan | 10.0 |
| Equipment Financing | 10.0 |
| Wheeling Pittsburgh Equity | 21.5 |
| Subtotal | $105.0 |

Pollution Control (Monessen and Allenport)

| EDA Guaranteed Loan | $ 36.5 |
|---|---|
| Total EDA Project | $141.5" |

EDA approved W–P's application by an action memorandum dated August 21, 1979. Vol. 1 A.R. (Administrative Record) 1–38. The U.S. Senate sustained the Appropriations Committee decision to finance W–P's rail mill. Vol. 24 A.R. 9232.

■ The scope of judicial review is governed by the Administrative Procedure Act, 5 U.S.C. § 706. The parties agree that we are concerned with informal agency action, not rule-making or action taken after an adjudicatory hearing. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, says in substance that the function of judicial review of informal agency action is to determine (1) authority of the agency, (2) compliance by the agency with prescribed procedures, and (3) any claim that agency action is arbitrary, capricious, or an abuse of discretion. Id. at 415–417, 91 S.Ct. at 823–824. This requires a substantial inquiry and a probing in depth review, but "the ultimate standard of review is a narrow one." Id. at 416, 91 S.Ct. at 824. Neither the substantial evidence test nor de novo review apply to informal agency action. Id. at 414–415, 91 S.Ct. at 822–823. The court may not substitute its judgment for that of the agency, must determine whether the agency has considered all relevant factors, and decide if the action has a rational basis on the facts. *Seatrain International v. Federal Maritime Commission*, D.C.Cir., 598 F.2d 289, 292–293. Our consideration is limited to whether the record facts supporting EDA action are adequately adduced and rationally applied. *American Petroleum Institute v. E.P.A.*, 10 Cir., 540 F.2d 1023, 1029, cert. denied 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601.

PWEDA § 702, 42 U.S.C. § 3212, provides:

"No financial assistance under this chapter shall be extended to any project when the result would be to increase the production of goods, materials, or commodities, or the availability of services or facilities, when there is not sufficient demand for such goods, material, commodities, services, or facilities, to employ the efficient capacity of existing competitive commercial or industrial enterprises."

During the congressional hearings on PWEDA, the Secretary of Commerce said: "We are also concerned where there is excess capacity in an industry and where the effect of new capacity would be to replace effective existing capacity." CF&I Br. at 22; Hearings on S. 1648 before Committee on Public Works, U.S. Senate, 89th Cong. 1st Sess. at 23 (1965). The regulations interpreting § 702 are in 13 C.F.R. § 309.2. Subsection (a) defines "capacity" as:

"that quantity of production or supply of services which could reasonably be expected to be produced or supplied over a sustained period of time by existing competitive enterprises for use within the market area under working schedules historically customary for the industry."

Subsection (c) sets forth the procedures for preparing a 702 Study. The applicant provides information on its proposal. Under § 309.2(c)(2) EDA verifies and evaluates the submitted information.

W–P does not presently make rails. The national manufacturers are U.S. Steel with two mills, Bethlehem with two mills one of which is shut down, and CF&I with one mill. The proposed W–P mill will put that company in the rail making business.

In its 38 page "Action Memorandum" and 49 page "Section 702 Study" EDA examined nine studies of the rail industry, including submissions of CF&I and other steel makers. From the comprehensive record EDA estimated the existing efficient capacity at 1.05–1.2 million tons and a 1983–1985 demand of 1.50–1.75 million tons. W–P's projected production from the new mill is estimated at 282,000 tons. The privately financed new CF&I mill is estimated to add 190,000 tons to the CF&I capacity. The 702 Study concluded that, 1 A.R. 65:

"Taking all the factors into consideration, we conclude that by 1983–1985, when the Wheeling-Pittsburgh rail mill is scheduled to come into full operation, demand will exceed the efficient capacity of existing competitive exterprises [sic] to produce rail and tie plates. Demand for these products should grow sufficiently to absorb and exceed projected output of the proposed mill."

■ CF&I challenges the EDA study on rails at great length and in careful detail. It complains of EDA's division of capacity into theoretical and actual figures, its use of percentages, its failure to inspect the facilities of the three rail making companies, and its economic analysis of the diverse factors which bear on rail demand. In essence, the CF&I objections go to the weight to be given facts which appear in the record. Factual certainty of future demand is impossible. Different conclusions can be drawn from the administrative record but the responsibility of decision rests with EDA. The record facts were adequately adduced and rationally applied. We may not substitute our judgment for that of the agency. We agree with the trial judge that the EDA study and decision on production and demand for rails have a rational basis on the facts.

■ CF&I challenged the adequacy of EDA's treatment of tie plates. The new W–P mill will produce tie plates which hold the rails on wooden ties. As to tie plates, EDA said, Vol. 1 A.R. 54, that no exact information was available on industry capacity to produce. It consulted a Department of Commerce expert on steel products, and said that, "None of the existing rail makers, or any other competing tie maker, has come forward with any data or even an unsupported claim of excess capacity." EDA reasoned that demand for tie plates would be commensurate with that for rails and concluded, Id., that it is "highly unlikely that there is any excess tie plate manufacturing." The trial court in its findings ¶¶ 50 and 51 said that the 702 Study determined that the demand for tie plates is closely related to that for rails and that the

demand for tie plates increased faster than the demand for rails. We are convinced that the EDA conclusion that tie plates should be considered together with rails has a reasonable basis and should be upheld.

CF&I complains that no 702 Study was done on structurals which are flanged beams used in construction and like activities. The argument is that W–P originally intended to produce structurals and contemplates a universal mill which will have the potential to produce structurals. The trial court permitted limited discovery by CF&I with regard to the W–P intent to produce structurals. George Raynovich, the secretary and general counsel of W–P, testified that when W–P made its loan application it had no intent to produce structurals. R. Vol. IX at 80. In a June 30, 1978, letter to EDA, Raynovich wrote that W–P "does not intend to produce any structural shapes in the new rail mill for at least five years and will produce structural shapes thereafter only if market conditions indicates that they should be produced." 24 A.R. 9440; see also 3 A.R. 1115.

The loan guarantee agreement precludes expenditure of any EDA funds to augment the mill with the equipment needed for production of structurals. 25 A.R. 9731. Also W–P covenanted that no modification or augmentation for production of structurals will be accomplished within 30 months of the "Guaranty Agreement" without the written consent of EDA. The 702 Study says, 1 A.R. 42:

"Because of the significant additional investment which would be required of the applicant, and because of the negative covenants in the guarantee agreement, this Agency finds that the possibility of future heavy structural production does not bar assistance pursuant to Section 702."

■ After considering the evidence adduced at the trial and the administrative record, the trial judge in his finding ¶ 58 said that a § 702 study of structurals was not required and that "EDA had a rational basis for not making such a study in the circumstances." We agree.

We note the recent decision in *Lukens Steel Co. v. Kreps*, E.D.Pa., 477 F.Supp. 444, a case relating to an EDA loan guarantee to a producer of specialty steel products. The court found an inconsistency in treatment in various steel products and, because of lack of clarity, remanded for additional findings and conclusions. Id. at 460–461. We find no troublesome inconsistencies in the record before us.

■ In projects relating to guarantees of fixed asset loans by a private lending institution, such as the one under consideration, 15% of the total project cost must be provided by applicant as equity capital. CF&I claims that W–P will not provide the required 15%. As noted above, the total EDA project requires $141.5 million, of which W–P provides equity capital of $21.5 million, slightly more than 15%. The 15% requirement is found in 13 C.F.R. § 306.14(b). EDA argues that the regulation is precatory rather than mandatory. Be that as it may, CF&I argues that $10.5 million of the project cost is attributable to structurals and must be subtracted from the W–P contribution. We have rejected CF&I's claim with regard to structurals. Hence, the cost of possible mill augmentation to include structurals is not a charge against the 15%. This case is distinguishable from *Lukens Steel Co. v. Kreps*, E.D.Pa., 477 F.Supp. 444, a case involving EDA assistance to a steel company. The court there held that the action of EDA under the 15% requirement was arbitrary and capricious because EDA permitted conversion of a debt to satisfy the requirement. Id. at 461–462. W–P puts up its own cash. During construction, equity and loan funds are used on a pro rata basis to insure satisfaction of the 15% requirement. We agree with the trial court that W–P's equity contribution was within the regulatory 15% requirement. See trial court's findings ¶¶ 69, 70, and 71.

■ CF&I sought discovery with respect to its contention that W–P intended to produce structurals and to its vague claim that EDA was guilty of fraud, bad faith, or bias. In applying the standard of review applicable here under 5 U.S.C. § 706(2)(A), "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106. The exception is where "there was such a failure to explain administrative action as to frustrate effective judicial review." Id. at 142–143, 93 S.Ct. at 1244. When the administrative record is inadequate, "the court may require the administrative officials who participated in the decision to give testimony explaining their action." *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825. Such showing is conditioned upon "a strong showing of bad faith or improper behavior." *Hercules, Inc. v. EPA*, D.C.Cir., 598 F.2d 91, 123.

CF&I had the opportunity, and failed, to show fraud, bad faith, or bias. It presented many interrogatories and the deposition of Marshall Schroeder from the EDA Office of Private Sector Investment in which CF&I questioned him concerning his doubts about the approval of the W–P loan application. The trial court's conduct of discovery was well within its discretion and is sustained. See *Ryan v. Hatfield*, 10 Cir., 578 F.2d 275, 276.

CF&I is understandably displeased that after it had spent $85 million of private capital on its steel mill in Pueblo, EDA guaranteed over $60 million for the construction of the competing W–P mill in the Pittsburgh area. It may be that unemployment and underemployment will shift from Pittsburgh to Pueblo but if that should happen, it results from the passage of PWEDA and its administration by EDA. The policy decisions are for Congress. Our review of the administrative action is limited. We agree with the trial court that the administrative record is adequate and that the informal agency action of EDA is rational.

Affirmed.