**AMERICAN WILDLANDS, Pacific Rivers Council, Montana Environmental Information Center, and Northern Plains Resource Council, Inc., Plaintiffs,**

v.

**Carol BROWNER, in her official capacity as the Administrator of the U.S. Environmental Protection Agency, Bill Yellowtail, in his official capacity as the Regional Administrator of the U.S. Environmental Protection Agency, Region VIII; and U.S. Environmental Protection Agency, an agency of the United States Government, Defendants,**

**Western Environmental Trade Association, on behalf of its members; State of Montana, Department of Environmental Quality, Intervenor–Defendants.**

**No. CIV.A. 98–K–1621.**

United States District Court, D. Colorado.

April 28, 2000.

Robert Baxter Wiygul, Earthjustice Legal Defense Fund, Inc., Denver, Douglas L. Honnold, James S. Angell, Earthjustice Legal Defense Fund, Bozeman, MT, Stephen D. Mashuda, Kristen L. Boyles, Earthjustice Legal Defense Fund, Seattle, WA, for plaintiffs.

David A. Carson, U.S. Department of Justice, Environment & Natural Resources Division, Denver, for defendants.

James B. Lippert, Rebecca Wunder Thomson, Gough, Shanahan, Johnson & Waterman, John Eric Bloomquist, Doney, Crowley & Bloomquist, PC, Claudia Leah Massman, Montana Dept. of Environmental Quality, Helena, MT, for Western Environmental Trade Association, intervenor-defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

### I. *Introduction.*

Plaintiffs, American Wildlands, Pacific Rivers Council, Montana Environmental Information Center, and Northern Plains Resource Council (collectively "American Wildlands") filed this action for declaratory and injunctive relief against Defendants, Carol Browner, in her official capacity as the Administrator of the U.S. Environmental Protection Agency; Bill Yellowtail, in his official capacity as the Regional Administrator of the U.S. Environmental Protection Agency; Region VIII; and the U.S. Environmental Protection Agency, an agency of the United States (collectively "EPA"). Additionally, there are two intervening parties on behalf of Defendants, State of Montana Department of Environmental Quality and Western Environmental Trade Association.

American Wildlands challenges EPA's failure to review and approve or disapprove Montana's new and revised water quality standards, its approval of several Montana water quality standards, and its

failure to promulgate standards that meet the requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"). They assert these failures violate the CWA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

## II. *Summary of Issues.*

American Wildlands raises five issues: (1) Whether EPA's approval of Montana's water quality standards exempting non-point source pollution from the state's anti-degradation rules is arbitrary, capricious, an abuse of discretion, or in violation of the CWA; (2) whether EPA's approval of Montana's water quality standards exempting mixing zones from compliance with narrative water quality criteria and the State's antidegradation rules is arbitrary, capricious, an abuse of discretion or in violation of § 303(c)(3)-(4) of the CWA, 33 U.S.C. § 1313(c)(2)(A) and the APA; (3) whether EPA has violated, and continues to violate 33 U.S.C. § 1313(c)(3)-(4), and 40 C.F.R. § 131.22(a)(1999), by failing promptly to promulgate replacement standards for those water quality standards that it disapproved on December 24, 1998 and January 26, 1999; (4) whether EPA's failure to review and approve or disapprove Montana's definition of an "interested person" is arbitrary, capricious, an abuse of discretion in violation of 33 U.S.C. § 1313(c)(3), 40 C.F.R. § 131.21, and the APA; and (5) whether EPA's incorporation and use of Montana's numerous new and revised water quality standards without EPA's prior approval and EPA's continued incorporation and use of water quality standards that were disapproved by EPA on December 24, 1998 and January 26, 1999 is arbitrary, capricious, an abuse of discretion in violation of § 303(c)(3) of the CWA, 33 U.S.C. § 1313 and the APA.

## III. *Jurisdiction.*

■ Jurisdiction exists under 33 U.S.C. § 1365(a)(2). "The district court shall have jurisdiction ... to enforce such an effluent standard or limitation, or such an order, or to order the administrator to perform such act or duty." 33 U.S.C. § 1365(a)(2). "Where questions of due process and sufficiency of the evidence are raised on appeal from an agency's final decision, the district court must review the agency's decision making process and conduct a plenary review of the facts underlying the challenged action." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1565 (10th Cir.1994).

## IV. *Background.*

### A. *Clean Water Act.*

Congress passed the CWA in an effort to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of these goals, § 1251(a)(7) states, "it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution." 33 U.S.C. § 1251(a)(7). In short, Congress prohibited the discharge from a point source of any pollutant into waters of the United States unless that discharge complied with specific requirements of the CWA. 33 U.S.C. § 1311(a). Compliance with these requirements may be achieved by obtaining and abiding by the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to § 402 of the CWA. 33 U.S.C. § 1342.

When a state revises or adopts a new standard for water, such standards must be submitted to the Administrator of the EPA ("Administrator"), and shall be established taking into account their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, navigation, and other purposes. 33 U.S.C.

§ 1313(c)(2)(A). The Administrator shall, within sixty days of submission, determine whether the standard offered meets the requirements of the CWA, in which case they become the water standard for the applicable waters of the state. 33 U.S.C. § 1313(c)(3). If the Administrator determines the standards do not meet CWA requirements, he shall notify the state within ninety days from the date of submission and specify the changes to meet such requirements. *Id.*

Water quality standards under the CWA are analyzed within three different areas. The first area is "designated uses of the water" such as public water supply or recreation. 33 U.S.C. § 1313(c)(2)(A). The second area is "criteria for all toxic pollutants" which articulates the amounts of various pollutants that may be present in the water without interfering with the designated uses. 33 U.S.C. § 1313(c)(2)(B). Such criteria shall be articulated either in the form of numeric concentration limits for specific pollutants or in a narrative form. 40 C.F.R. § 131.11(b) (1999). The final area is the antidegradation policy, which requires the state to adopt policies in this area. 33 U.S.C. § 1313(d)(4)(B). Under the CWA, states are expected to hold hearings at least once every three years to review applicable water quality standards and modify such standards if appropriate. 33 U.S.C. § 1313(c).[1]

B. *Relevant Events.*

From 1989 to 1998, Montana implemented a number of revisions to different components of its water quality standards. On March 5, 1998, pursuant to the CWA provisions regarding notice of "citizen suits" 33 U.S.C. § 1365(b)(2), American Wildlands, Pacific Rivers Council, and Montana

Environmental Information Center filed a sixty days notice of violation by the EPA under the CWA for its alleged failure to perform the mandatory duty to review and approve or disapprove Montana's water quality standards. (Administrative Record Document (A.R.Doc.) 36.)[2] American Wildlands asserted the EPA had failed since 1994 to approve or disapprove Montana's revised water quality standards as required by the CWA. On September 24, 1998, Northern Plains Resource · Council followed suit filing similar notice of violation against the EPA. (A.R.Doc. 44.)

In early December, 1998, American Wildlands wrote a letter to the EPA pointing out alleged legal and factual shortcomings of letters sent by Montana to the EPA regarding clarification which the EPA sought about certain aspects of Montana's water quality standards. (A.R. Doc 48.) The gist of this letter was to urge the EPA to disapprove the standards of water quality submitted by Montana. Shortly thereafter, American Wildlands sent a follow up letter detailing further concerns over the water quality standards submitted (A.R.Doc. 49.)

On July 27, 1998, American Wildlands filed the instant action alleging EPA violated the CWA and the APA by (1) failing to approve or disapprove Montana's new and revised water quality standards since 1989 and (2) failing promptly to prepare and promulgate proposed standards for those state standards that failed to meet the requirements of CWA. (R. Doc. 1.) On October 16, 1998, Western Environmental Trade Association moved to intervene as a Defendant. (R. Doc. 8.) On October 28, 1998, American Wildlands moved for Summary Judgment. (R. Doc. 20.) On October 19, 1998, the State of Montana moved to intervene on the side of EPA. On No-

---

1. Contrary to the allegations stated in American Wildlands' Amended Complaint, (R. Doc. 46; ¶ 18), this does not mean the state must necessarily revise the standards.

2. Because the record is so large, there are references to both the Administrative Record ("A. R.") and the Record ("R."), which include the parties' briefs.

vember 4, 1998, I granted Western Environmental Trade Association's Motion to Intervene. (R. Doc. 27.) After denying Montana's first motion to intervene for failure to comply with this court's local rules, I granted its second motion to intervene, filed on November 9, 1998. (R. Doc. 32.) On February 26, 1999, American Wildlands' Motion for Summary Judgment was denied without prejudice. (R. Doc. 42.)

In December, 1998 and January, 1999, the EPA acted to approve and disapprove certain of Montana's revised water standards, (A.R.Doc. 55, 58) following which, American Wildlands amended its complaint, (R. Doc. 46). In addition to seeking declaratory relief, the amended complaint seeks a variety of forms of injunctive relief which would require the EPA to review the definition of "interested person;" to review all permits and other regulatory actions taken by Montana that relied on water quality standards that were either not approved or disapproved by the EPA; to disapprove Montana's categorical exemptions for nonpoint source pollution and its mixing zones; and to promulgate replacement standards for all disapproved standards. (*Id.*)

On September 23, 1999, EPA filed a motion for a limited voluntary remand of EPA's decision to approve Montana's mixing zone policy so that "EPA [could] reconsider that policy in light of EPA guidance regarding the application of certain narrative criteria within mixing zones." (R. Doc. 61.) On November 30, 1999, the EPA completed its review on remand, again approving Montana's mixing zone provisions. (R. Doc. 84.) Following the approval on remand, EPA and American Wildlands filed supplemental briefs. (R. Doc. 81, 84.)

## V. *Standing.*

 Defendants, Western Environmental Trade Association and EPA challenge American Wildlands standing to bring this action. In order to satisfy Article III standing requirements,

> a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Additionally, an association has standing to bring suit on behalf of its members when those members would have standing to sue on their own, the issue being addressed is related to the organization's purpose, and neither the claim asserted nor relief requested requires the participation of these individual members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Thus, the relevant showing for Article III standing is injury to the plaintiff, not the environment. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, —— U.S. ——, 120 S.Ct. 693, 703–06, 145 L.Ed.2d 610 (2000).

Members of American Wildlands assert 'injuries in fact' through a number of affidavits. They claim aesthetic, conservation, and economic interests in preserving Montana's waters, referring to use of these waters in the form of drinking, fishing, swimming, and agricultural and household use.

For example, American Wildlands member, Eva Skidmore ("Skidmore") cites the receipt of a permit by the Big Sky Water and Sewer District to discharge sewage into the Gallatin River. (R. Doc. No. 77; Ex. 16.) Skidmore frequently canoes this stretch of river to fish and to experience one of the more pristine stretches of water in Montana. (*Id.*) In addition to the health risks that the sewage deployment arouses,

Skidmore also feels harmed by the severe impacts on her aesthetic interests. (*Id.*)

David Bayles ("Bayles"), conservation director of Pacific Rivers Council, having spent a portion of nearly every year of his life in Montana, claims an interest in Montana's waters. (R. Doc. No. 77; Ex. 17, at 2.) Bayles has and will continue to fish, swim and go boating on Montana's waters. (*Id.*) He contends any lowering of standards designed to protect Montana's waters has a severe impact on his and other members aesthetic, conservation, and economic interests. (*Id.* at 3.)

James Jensen ("Jensen"), executive director of Montana Environmental Informational Center, contends his aesthetic, conservation, and recreational interests are being compromised. (R. Doc. No. 77; Ex. 18.) Jenson rafts, kayaks, fishes, and photographs many of Montana's rivers. (*Id.*) He contends more pollution and relaxed water standards have a severe impact on his and his members' aesthetic, conservation, and economic interests. (*Id.*)

Paul Hawkins ("Hawkins"), volunteer board member of Northern Plains Resource Council, owns and operates a hay and cattle ranch on Sweet Grass Creek. (R. Doc. No. 77; Ex. 19.) Hawkins uses this water for purposes of drinking water, household use, stock and crop irrigation, fishing, and other forms of recreation. (*Id.*) Hawkins contends relaxed protections of Montana's waters threaten his and his fellow members aesthetic, conservation, and economic interests in the waters. (*Id.*)

■ These affidavits of American Wildlands' members suffice to establish they have suffered an injury in fact to their aesthetic, conservation, and economic interests. The injuries are not hypothetical because they have already occurred and will continue to occur as American Wild-

lands members continue to participate in the activities listed above. Finally, American Wildlands, if successful in the action at hand, will have these injuries addressed, as the EPA essentially promulgates the rules for Montana's waters. Therefore, American Wildlands has standing.

## VI. *Standard of Review.*

Section 701 of the APA provides agency action is subject to judicial review except where there is a statutory prohibition on review or where agency action is committed to agency discretion as a matter of law. 5 U.S.C. § 701(a)(1), (2), construed in *Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 641–42 (10th Cir.1990). "The scope of judicial review of agency action under the APA is set forth in the Supreme Court's seminal opinion in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573 (10th Cir.1994). A reviewing court may set aside agency findings that do not meet the six separate standards quoted below. *Id.* at 1574. An agency finding may be set aside if it is found to be:

"(a) [A]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations or short of statutory right; (d) without observance of procedure required by law; (e) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (f) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

*Id.* at 1574 (quoting 5 U.S.C. § 706).

■ "An agency's action is entitled to a presumption of regularity, 'but that pre-

sumption is not to shield [the agency's] action from a thorough, probing, in-depth review.'" *Id.* (quoting *Overton Park*, 401 U.S. at 415, 91 S.Ct. 814). It is improper for a district court to use procedures designed for trial when that court is acting as a court of appeal. Substantial evidence is needed to affirm agency action which may only be affirmed on the 'grounds articulated by the agency itself. *Id.*

■ *Olenhouse* crystallized the essential function of judicial review as being "a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious, or an abuse of discretion." *Id.* (citing *CF & I Steel Corp. v. Economic Dev. Admin.*, 624 F.2d 136, 139 (10th Cir.1980)). While the first two of these legal principles are straightforward, the "arbitrary and capricious" principle is more difficult to apply.

■ In reviewing an action under the "arbitrary and capricious" standard, the court should ascertain whether the agency "examined relevant data and articulated a rational connection between the facts found and the decision made." *Id.* (citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814). When the "arbitrary and capricious" standard is used to assure factual support, "'there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a "nonarbitrary" factual judgment supported only by evidence that is not substantial in the APA sense.'"

*Olenhouse*, 42 F.3d at 1575 (quoting *Association of Data Processing v. Bd. of Governors*, 745 F.2d 677, 683 (D.C.Cir.1984)). Finally, while the EPA is entitled to some deference, if its decision making was "arbitrary and capricious" it will be set aside. *See id.*

## VII. *Merits.*

### A. *Exempting Nonpoint Source Pollution.*

■ American Wildlands contends the EPA's approval of Montana's Water quality standards exempting non-point source pollution from the state's antidegradation rules is arbitrary, capricious, an abuse of discretion, or in violation of the CWA. Water quality standards "serve the dual purposes of establishing the water quality goals for a specific body of water and serve as the regulatory basis for the establishment of water-quality-based treatment controls and strategies ..." 40 C.F.R. § 131.2 (1999). The EPA only has the authority to approve state water quality standards that are consistent with the CWA. 33 U.S.C. § 1313(c)(3).

"Point source" is defined as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "The concept of a point source was designed to further the scheme to eliminate pollution of the nation's waters by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." *United States v. Earth Sciences Inc.*, 599 F.2d 368, 373 (10th Cir.1979).

The legislative history of the CWA illustrates Congress was classifying "nonpoint source pollution" as "disparate runoff caused primarily by rainfall around activities that employ or cause pollutants." *Id.*

The Senate Report discussion of proposed legislation that led to the promulgation of 33 U.S.C. § 1314 contains the following statements about nonpoint source pollution:

> One of the common problems associated with pollution control is the dramatic increase in storm runoff when the earth's surface is made impermeable. Thus, highways, buildings, and parking lots all contribute substantially to accelerated runoff of rainwater into natural water systems. The greater volume and velocity produced cause high rates of erosion and siltation.

*See* Staff of Senate Comm. on Public Works, 93 Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, 1470–71 (Comm. Print 1973). The Clean Water Act pertinently states, "it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution." 33 U.S.C. § 1251(a)(7). In short, Congress prohibited the discharge from a point source of any pollutant into waters of the United States unless that discharge complies with specific requirements of the CWA. *See* 33 U.S.C. § 1311(a).

Compliance with these requirements may be achieved by obtaining and abiding by the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to § 402, of the CWA. 33 U.S.C. § 1342. The Tenth Circuit has recognized:

> Whether a discharge is made through a point source is crucial for application of enforcement provisions of [the CWA] because pollutants discharged through point sources are regulated by effluent limitations and require a permit. Because nonpoint sources of pollution, such as oil and gas runoffs caused by rainfall on the highways, are virtually impossible to isolate to one polluter, no permit or regulatory system was established as to them.

*Earth Sciences,* 599 F.2d at 371.

Congress has left the regulation of nonpoint sources up to the states. *See* 33 U.S.C. § 1329.[3] Additionally, Congress has not required states to establish federally enforceable nonpoint source controls. *Id.*[4] On the other hand, water quality standards are applicable to nonpoint sources under the Total Maximum Daily Load ("TMDL") program because states must identify load allocations from nonpoint sources on state waters for which technology-based effluent limitations are not sufficient to achieve the applicable water quality standards. 33 U.S.C. § 1313(d); 40 C.F.R. § 130.7(b)(1999). A TMDL is "the sum of the individual wasteload allocations for point sources and load allocations for nonpoint sources and natural background .... The TMDL process provides for nonpoint source control tradeoffs." 40 C.F.R. § 130.2(i).

Antidegradation policies under the CWA are split into three tiers. "Tier I" requires EPA regulations to be consistent with the following: "(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. § 131.12(a)(1). "Tier II" water regulations provide:

---

**3.** "Section 131.12(a)(2) does not mandate that states establish controls on nonpoint sources." *EPA: Water Quality Standards Handbook,* (2nd ed.1994) (citing 40 C.F.R. § 131.12(a)(2)) (A.R.Doc. 17.)

**4.** "Section 319 does not require states to penalize nonpoint source polluters who fail to adopt best management practices; rather it provides for grants to encourage the adoption of such practices." *Natural Resources Defense Council v. U.S. EPA,* 915 F.2d 1314, 1318 (9th Cir.1990).

(2) Where the quality of the waters exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost effective and reasonable best management practices for nonpoint source control.

*Id.* (a)(2). "Tier III" water regulations provide: "(3) Where high water quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected." *Id.* (a)(3).

Montana's antidegradation policy regarding nonpoint sources exempts "exist-ing activities that are nonpoint sources of pollution as of April 29, 1993" from antidegradation review. Mont.Code Ann. § 75–5–317(2)(a)(1999). Such an exemption occurs "when reasonable land, soil, and water conservation practices are applied and existing and anticipated beneficial uses will be fully protected." *Id.* (2)(b).[5]

EPA's regulations implementing the CWA require that state water quality standards include "a statewide antidegradation policy" to ensure that "existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. § 131.12(a)(1) (1999).[6] At a minimum, state water quality standards must satisfy these conditions. *PUD No. 1 v. Washington Dep't of Ecology,* 511 U.S. 700, 705, 114 S.Ct. 1900, 128 L.Ed.2d 716(1994).

American Wildlands contends exempting nonpoint sources of pollution undermines the objectives of the CWA. EPA maintains it lacks authority under the CWA to require states to establish regulatory programs for nonpoint sources. Additionally, EPA argues, because there is no permit procedure for nonpoint source pollution, it would be unrealistic to regulate nonpoint source pollution through its antidegradation policy.[7] Furthermore, EPA argues, while nonpoint source pollution may be relevant to whether water quality stan-

**5.** In response to a question from the EPA, Montana made clear: " § 75–5–317(2), Mont. Code Ann ("MCA"), only exempts nonpoint sources from Tier II review." (A.R. Doc. 56 at 01786.) Thus, the exemption does not apply to Tier I and Tier III reviews.

**6.** The rationale behind the antidegradation regulatory statement regarding achievement of statutory requirements for point sources and all cost effective and reasonable BMP's for nonpoint sources is to assure that, in high quality waters, where there are existing point or nonpoint source control compliance problems, proposed new or expanded point sources are not allowed to contribute additional pollutants that could result in degradation. Where such compliance problems exist, it would be inconsistent with the philosophy of the antidegradation policy to authorize the discharge of additional pollutants in the absence of adequate assurance that any existing compliance problems will be resolved... EPA believes that its antidegradation policy should be interpreted on a pollutant-by-pollutant and waterbody-by-waterbody basis.

*EPA: Water Quality Standards Handbook,* (2nd ed.1994), (A.R. Doc. 17 at 00296.)

**7.** "EPA Region VIII also does not believe that the Clean Water Act, as interpreted by EPA regulation at 40 C.F.R. § 131, creates a federal requirement for states to regulate nonpoint sources such that water quality standards and antidegradation requirements are satisfied." (A.R. Doc. 10 at 00211.)

dards are being achieved, this does not mean EPA can require a state to implement nonpoint source control programs.

American Wildlands asserts EPA's approval of Montana's water quality standards exempting nonpoint source pollution from the state's antidegradation rules is arbitrary and capricious. "[The] essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious, or an abuse of discretion." *Olenhouse*, 42 F.3d at 1574. In reviewing an action under the "arbitrary and capricious" standard, I ascertain whether the agency "examined relevant data and articulated a rational connection between the facts found and the decision made." *Id.* (citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). In reviewing the agency's explanation, I determine "whether the EPA considered all relevant factors and whether there has been a clear error of judgment." *See Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814).

"Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within the range." *Olenhouse*, 42 F.3d at 1574 (citing *CF & I Steel*, 624 F.2d at 139). The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The CWA requires that states periodically review wa-

ter quality standards and secure EPA's approval of any revision of those standards. EPA does not have the authority to approve state water quality standards that are inconsistent with the CWA. 33 U.S.C. § 1313(c)(3). Under the CWA, the only recognized means for enforcing water quality standards is through National Pollution Discharge Elimination Permits ("NPDES") for point source discharges. *See* 33 U.S.C. § 1311(e) and § 1342(a).

The CWA clearly makes a distinction. between point and nonpoint sources. Point sources are regulated by the NPDES and must comply with both effluent and water quality limitations. 33 U.S.C. § 1342. In contrast, "the discharge of pollutants from nonpoint sources— for example, the runoff of pesticides from farmlands— was not directly prohibited." *Natural Resources Defense Council*, 915 F.2d at 1316. "Section 319 does not require states to penalize nonpoint source polluters who fail to adopt best management practices; rather it provides for grants to encourage the adoption of such practices." *Id.* at 1318.

 The maxim, *inclusio unius est exclusio alterius*, refers to the principle of interpretation that the inclusion of one is the exclusion of another. Where the law expressly describes a particular situation to which it shall apply, an irrefutable inference must be drawn that what is excluded was intended to be excluded. *Kevin McC v. Mary A*, 123 Misc.2d 148, 473 N.Y.S.2d 116, 118 (N.Y.Fam.Ct.1984). Applying the maxim here, the inclusion of law regarding point source pollution and the lack of law specifically regulating nonpoint source pollution implies Congress did not intend the CWA to regulate nonpoint source pollution.

"It is clear from the legislative history Congress would have regulated so-called nonpoint sources if a workable method could have been derived." *Earth Sciences,*

599 F.2d at 372. "The [CWA] focused on point source polluters presumably because they could be identified and regulated more easily than nonpoint source polluters." *Natural Resources Defense Council,* 915 F.2d at 1316. Thus, given the specific wording of the CWA about point source pollution and the lack of wording about nonpoint pollution, EPA has acted within the range of authority and discretion Congress afforded it. The deference given to the state in implementing water quality standards is also persuasive EPA has acted within its range of authority.

"Determination of whether the agency complied with prescribed procedures requires a plenary review of the record and consideration of applicable law." *Olenhouse,* 42 F.3d at 1574. The EPA is guided in its application of regulations by the CWA. As required by the CWA, Montana reviewed its water quality standards which led to a change in the regulation of nonpoint sources. The change in regulation, which exempted nonpoint sources from regulation, must conform with CWA guidelines in order for the EPA to approve the change. In its Water Quality Standards Handbook ("Handbook"), the EPA states there is a distinction between "the applicability of water quality standards versus the enforceability of controls designed to implement standards." (A.R. Doc. 17 at 00297.) The Handbook adds: "[W]ater quality standards are applicable to all waters in all situations, regardless of activity or source of degradation. Implementation may not be possible in all circumstances." (Id. at 00298.) [8] The administrative record clearly supports the EPA's determination that Montana does not have to regulate nonpoint sources for purposes of the EPA's regulation regarding antidegradation policies.

In making its determination, the EPA considered all of the relevant factors. In approving the nonpoint source exemption, it stated,

> our review of the categorical exclusions considered two basic questions: 1) is the activity regulated? and 2) is it reasonable to conclude discharge will be non-significant [sic]? Because water quality standards describe water quality goals for surface waters irrespective of the existing or potential pollution sources, it is our view that all regulated and non-regulated activities that contribute pollution to surface waters ideally should be subject to nondegradation (antidegradation) requirements. However, the federal statutory and regulatory antidegradation requirements have not, in our view, created any additional regulatory authority over otherwise unregulated activities. Therefore, although we expect states to apply antidegradation requirements to regulated activities, we encourage, but do not require, them to do so for non-regulated activities.

(A.R. Doc. 58 at 1813.)

The administrative record also illustrates Montana has an active program that addresses nonpoint source pollution through education and voluntary compliance rather than regulation. Additionally, the Tenth Circuit has stated, because nonpoint sources of pollution, such as oil and gas runoffs caused by rainfall on the highways, are virtually impossible to isolate to one polluter, no permit or regulatory system was established as to them. *See Earth Sciences,* 599 F.2d at 371. Finally, nothing in the CWA demands that a state adopt a regulatory system for nonpoint sources. Given this inability to isolate nonpoint source pollution to one identifiable source, and the silence of law regarding regulation of nonpoint sources, it cannot be said the EPA clearly erred in

---

8. The "EPA Region VIII also does not believe that the CWA, as interpreted by EPA regulations at 40 C.F.R. § 131, creates a federal requirement for states to regulate nonpoint sources such that water quality standards and antidegradation requirements are satisfied." (A.R. Doc. 10 at 00211.)

exempting nonpoint source pollution from Tier II antidegradation review. Therefore, under the *Olenhouse* standard, the EPA has successfully examined the relevant data and articulated a rational connection between the facts found and the decision made. For these reasons the EPA decision is affirmed on this first issue.

B. *Approval of Montana's Mixing Zone Policy.*

■ American Wildlands contends the EPA's approval of Montana's water quality standards exempting mixing zones from compliance with narrative water quality criteria and the state's antidegradation rules is arbitrary and capricious or in violation of the CWA. "It is not always necessary to meet all water quality criteria within the discharge pipe to protect the integrity of the water body as a whole. Sometimes it is appropriate to allow for ambient concentrations above the criteria in small areas near outfalls. These areas are called mixing zones." *EPA: Water Quality Standards Handbook,* (2nd ed. 1994) (A.R. Doc. 17 at 00303.) Essentially, mixing zones are "limited areas or volumes of water where initial dilution of a discharge takes place and where numeric water quality criteria can be exceeded but acutely toxic conditions are prevented." *EPA Region VII Mixing Zones and Dilution Policy* (1995) (A.R. Doc. 19 at 00304.)

"It is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." 33 U.S.C. § 1251(a)(3). The decision to create mixing zones is left to the discretion of the state, but any decision to allow mixing zones must be consistent with the CWA. 33 U.S.C. § 1313(d)(4)(B). Under EPA review, state decisions regarding mixing zones are subject to the NPDES permit process.(A.R. Doc. 19 at 00364.)

To assist states in developing mixing zone procedures, EPA developed mixing zone guidance. That guidance identifies key issues such as the identification of "criteria to limit the size of the mixing zone, in-zone quality requirements, and dilution allowances." (A.R.Doc. 58.) "Allowable mixing zone characteristics should be established to ensure that (1) mixing zones do not impair the integrity of the water body as a whole; (2) there is no lethality to organisms passing through the mixing zone; and (3) there are no significant health risks, considering likely pathways of exposure." (A.R. Doc. 17 at 00303).

While certain numeric criteria for a certain substance may not apply, "all mixing zones shall be 'free from' substances that (i) settle to form objectionable deposits; (ii) float as debris, scum, oil, or other matter; (iii) produce objectionable color, odor, taste, or turbidity; (iv) are acutely toxic; (v) produce undesirable or nuisance aquatic life," (A.R. Doc. 19 at 00377). A limited exception is provided "where the discharge is to a river or stream, dilution is available at critical conditions, and available information is sufficient to reasonably conclude there is near instantaneous and complete mixing of the discharge with the receiving water (complete mixing), an appropriate dilution allowance may be provided." (*Id.*) Whether such a limited situation (complete mixing) occurs will be determined by the NPDES permit rationale. (*Id.*)

"Unfortunately, it is not possible to establish a wholly deterministic procedure (i.e., a "black box") with which to make all mixing-zone dilution decisions. Nor is it advisable to make all mixing-zone dilution decisions based on a simplistic approach which overlooks the mixing characteristics and water body uses (i.e., fish spawning, drinking water supply) particular to a site." (A.R. Doc. 19 at 00364.) "Accordingly, mixing zone dilution policies ...should clearly set forth the considerations, guidelines, and default assumptions

that will be utilized in making such case-by-case decisions." (*Id.*)

Montana's laws articulate the state shall "adopt rules governing the granting of mixing zones, requiring that mixing zones granted by the department be specifically identified and that they have: (a) the smallest practicable size; (b) a minimum practicable effect on water uses; and (c) definable boundaries." Mont.Code Ann. § 75–5–301(4)(a)-(c)(1999). American Wildlands contends Montana's water quality law does not provide any substantive restrictions on the size, shape, or location of the mixing zone. It also argues Montana has failed to require designated uses be protected through narrative or numeric water quality criteria within a mixing zone as long as the state has enacted "restrictions elsewhere which provide for the same environmental outcome" as the application of narrative criteria. American Wildlands further contends the inclusion of selected boilerplate narrative criteria placed in NPDES permits was arbitrary and capricious. Finally, American Wildlands contends Montana's mixing zone policy should be rejected because it does not comply with antidegradation review. EPA responds Montana's laws regarding mixing zones contain a number of restrictions which prohibit acute lethality within the mixing zone area, ensure a mixing zone does not extend to drinking water intakes, and ensure the passage of fish and aquatic life through the mixing zone area.

Analysis of the mixing zone issue requires a review under the *Olenhouse* standard. *See Olenhouse*, 42 F.3d at 1574. Although the EPA recommends a list of criteria which a mixing zone will be "free from," EPA leaves open the possibility of alternate protection, if adequate restrictions elsewhere provide for the same environmental outcome. (A.R. Doc 19 at 00377; EPA's Decision to Approve Section 17.30.507(1) of Montana's Mixing Zone Rule (A.R. Doc. 117 at 3181.)) Additionally, Montana has made efforts to protect water quality criteria of mixing zones by applying narrative criteria within mixing zones through the Montana Pollutant Discharge Elimination System ("MPDES"). (A.R. Doc. 114, 115, 116, & 117.) If such protections did not exist through the MPDES, the policy might be contrary to the EPA and the CWA guidelines. As discussed above, however, the protections are present and thus the Montana mixing zone law complies with the CWA.

American Wildlands contends EPA is inconsistent in stating it is acceptable to exempt mixing zones from numeric and narrative criteria if adequate restrictions provide for the same environmental outcome. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Here, however, EPA has not changed its position. It has consistently stated the suggested method of measuring minimum mixing zone quality by numeric and narrative criteria is a recommended, rather than a required, method. (A.R. Doc. 19 at 00371; A.R. Doc. 109 at 2897; A.R. Doc. 110 at 2890–1.) [9]

American Wildlands' contention that EPA's reliance on Montana's boilerplate language is arbitrary and capricious, is inapposite. The task at hand is to evaluate the validity of the Montana law approved by the EPA, rather than to evaluate how that law is executed. American Wildlands compares language of the Montana statute with language in MPDES permits, which do not contain all of the wording conceived in the statute. (A.R. Doc. 118 at 3184.) It is significant, however, to

---

**9.** EPA uses the words "recommend" and "should" interchangeably.

note that the statute quoted, Mont. Admin. R. 17–30–637, is consistent with the CWA.

■ American Wildlands' argument that Montana's mixing zone policy does not comply with antidegradation review is also flawed. While mixing zone water quality is only a portion of the quality for a water body, antidegradation focuses on the quality of the water body as a whole. Concerning mixing zones, EPA guidance specifically provides: "It is not always necessary to meet all water quality criteria within the discharge pipe to protect the integrity of the water body as a whole. Sometimes it is appropriate to allow for ambient concentrations above the criteria in small areas near outfalls. These areas are called mixing zones." (A.R. Doc. 17 at 00303.) Additionally, when a specific and a general law are present, the specific law prevails in authority. Here, the mixing zone guidance is more specific than antidegradation policy which focuses on the quality of a water body as a whole, and thus prevails.

A careful examination of the record reflects EPA has examined the relevant data and there is a rational connection between the facts found and the EPA's decision to approve Montana's mixing zone policy. The administrative record supports a finding that narrative and numeric criteria are recommended, rather than required, methods of measurement of water quality in mixing zones. Following *Olenhouse,* I find all three elements of judicial review have been satisfied. Specifically, the EPA has examined the relevant data and articulated a rational connection between the facts found and its decision. It cannot be said that the EPA clearly erred in this regard. Therefore, EPA's approval of Montana's mixing zone policy is affirmed.

C. *Promulgating Replacement Standards.*

■ American Wildlands asserts EPA has violated its duty promptly to promul-

gate replacements for Montana's disapproved standards in violation of 33 U.S.C. § 1313(c)(3)-(4).

> If the administrator determines that any such revised or new standard is not consistent with the applicable requirements of this chapter, he shall not later than the ninetieth day after the date of submission of such standard notify the State and specify the changes to meet such requirements. If such changes are not adopted by the state within ninety days after the date of notification, the Administrator shall promulgate such standard . . . .

33 U.S.C. § 1313(c)(3). Thus, if EPA notifies a state of its disapproval of standards and changes are not made within ninety days, EPA shall promulgate such standards.

The CWA, however, provides an exception to this rule: "The administrator shall promulgate any revised or new standard under this paragraph not later than ninety days after he publishes such proposed standards, unless prior to such promulgation, such State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter." 33 U.S.C. § 1313(c)(4)(B)(emphasis added). Therefore, the CWA does not require adherence to the ninety day requirement, when the state adopts a revised standard.

The Tenth Circuit has held when an agency fails to comply with a statutorily imposed absolute deadline it has withheld agency action and the court must compel agency action upon proper application. *Forest Guardians v. Babbitt,* 164 F.3d 1261, 1272 (10th Cir.1998). "When an agency is required to act—either by organic statute or by the APA—within an expeditious, prompt, or reasonable time, § 706 [of the APA] leaves in the courts the discretion to decide whether agency delay is unreasonable." *Id.* "Section 706 requires

that a reviewing court 'shall compel agency action ... unreasonably delayed.'" *Id.*

American Wildlands contends, based on what it perceives as a history of inaction by EPA, "it would be inappropriate to sit back and trust that Montana and EPA will act swiftly and properly." (R. Doc. 77 at 21.) EPA contends Montana will address the issue by January or February of 2000.

Montana has amended all but two of the disapproved standards. (R. Doc. 62 at 46.) With reference to the remaining two standards, I must determine whether the delay has been unreasonable, bearing the standards of *Olenhouse* in mind. Montana informed the EPA it would amend these standards by the end of January or February, 2000. The post-ninety day response by the EPA is waived when the state adopts new standards. 33 U.S.C. § 1313(c)(4). In light of Montana's stated intentions, and the fact it had already successfully amended a number of other standards, it was not unreasonable for the EPA to wait until the end of February. Moreover, under the CWA, EPA's decision is within its scope of authority and it has articulated a rational connection between the facts found and the decision it made. Therefore, EPA is not in violation of the CWA.

The record does not reflect whether Montana has revised such standards. If it has the EPA is not required to take further action; if it has not then EPA is required to promulgate new standards. Based on the record before me, however, I find the EPA is not in violation of 33 U.S.C. § 1313(c)(3)-(4).

### D. *Interested Person.*

 American Wildlands contends EPA's failure to review and approve or disapprove Montana's definition of an "interested person" is arbitrary, capricious, an abuse of discretion in violation of 33 U.S.C. § 1313(c)(3), 40 C.F.R. § 131.21, and the APA. The procedure for approving or disapproving standards under 33 U.S.C. § 1313(c)(3) is discussed above. CWA's "general policies" articulates: "States may, at their discretion, include in their standards, policies generally affecting their application and implementation, such as mixing zones, low flows and variances. Such policies are subject to EPA review and approval." 40 C.F.R. § 131.13 (1999).

Montana's code defines "interested person" as "a person who has a real property interest, a water right, or an economic interest that is or may be directly and adversely affected by the department's preliminary decision regarding degradation of state waters, pursuant to [MCA] § 75–5–303. This term includes a person who has requested an authorization to degrade high-quality waters." MCA § 75–5–303(5)(1999).

American Wildlands contends EPA must review the definition because the list of policies in the definition of "general policies" is not exhaustive. American Wildlands also asserts Montana's definition is inconsistent with federal standing requirements because it does not cover injuries to recreational, aesthetic, and conservational interests. EPA responds, while the "general policies" list is not exhaustive, it is representative of only substantive policies, whereas, the definition of "interested person" encompasses a procedural definition to which the "general policies" statement does not apply. In addition, EPA argues, because the definition of "interested person" applies only to degradation of waters and antidegradation review only applies to point source discharges, in practice, Montana may only authorize degradation of a Tier II water when issuing an MPDES permit. Therefore, EPA argues, the definition will only apply when Montana grants or denies an MPDES permit.

The issue is whether the definition of "interested person" is among the "policies"

that EPA is required to review. Because the issue is whether the EPA must review the definition, there is no need to reach the merits of the definition. The CWA does not specifically state that "interested person" shall be defined. Rather, it articulates general policies, including the encouragement of public participation. 33 U.S.C. § 1251(e).

While the CWA encourages public participation, the general policy makes no allusion to procedural policies. Notably, while the interests of those with recreational, aesthetic, and conservational interests may not be given a voice under this definition, the definition only applies to a state's final agency or department decision. Thus, the administrative process as a whole does not exclude participation of those wanting to be heard on recreational, aesthetic, and conservational issues. They are excluded only from appealing a final agency decision when their interest is solely limited to recreation, aesthetics, or conservation.

Here the specific policy trumps the general policy. The CWA and its regulations specifically state what policies must be reviewed by the EPA. This specific provision prevails over the general policy of encouraging public participation. Additionally, because the CWA has not hinted that procedural policies should be reviewed, and interested parties retain a voice in the administrative process, EPA's decision is within its scope of authority. EPA has articulated a rational connection between the facts found and the decision not to review the definition of "interested person." Therefore EPA is not in violation of 33 U.S.C. § 1313(c)(3),and 40 C.F.R. § 131.21.

### E. *Montana's Reliance on Disapproved Standards.*

American Wildlands contends EPA's incorporation and use of Montana's numerous new and revised water quality standards without EPA's prior approval and EPA's continued incorporation and use of water quality standards that were disapproved by EPA on December 24, 1998 and January 26, 1999 is arbitrary, capricious, an abuse of discretion in violation of § 303(c)(3) of the CWA, 33 U.S.C. § 1313 and the APA. American Wildlands asks me to order EPA promptly to "review any permit, decision, or other regulatory action that incorporated or otherwise relied upon the disapproved standard" and to revise the former actions as necessary. (Pls.' Opening Br., R. Doc. 57 at 48.)

The CWA states, "a state water quality standard remains in effect, even though disapproved by EPA, until the state revises it or EPA promulgates a rule that supersedes the state water quality standard." 40 C.F.R. § 131.21(c) (1999).[10] The CWA further states "review of the Administrator's action . . . . (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides. . . ." 33 U.S.C. § 1369(b)(1)(F). "If the Administrator, within sixty days after the date of submission of the revised or new standard, determines that such standard meets the requirements of this chapter, such standard shall thereafter be the water quality standard for the applicable waters of that State." 33 U.S.C. § 1313(c)(3).

American Wildlands seeks injunctive relief on this issue. The sole purpose of such relief is to prevent future acts or violations from occurring, not to punish past violations. *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). If, however, the activity causing the past violation has been abandoned and there is little probability that the violation will be re-

---

**10.** Despite the fact EPA has proposed to change this rule (64 Fed.Reg. 37073 (July 9, 1999)) the rule has yet to be changed and EPA must follow the current regulation.

sumed, then issuance of an injunction is not warranted. *Id.*

American Wildlands poses two issues: (1) Whether Montana's disapproved standards should remain effective pending their revision and approval by EPA; and (2) whether EPA should re-visit past decisions that relied upon disapproved standards. American Wildlands contends standards disapproved by the EPA should not remain in effect and past decisions relying on disapproved standards should be revisited. EPA contends this court lacks jurisdiction over this cause of action; nearly all of the previously disapproved standards have been approved rendering the issue moot; and the standards which have yet to be approved are presumed to be approved as discussed above. EPA further contends, because injunctive relief is aimed at preventing future violations and the disapproved standards for the most part have been approved such relief is not appropriate.

■ American Wildlands uses a TMDL as its sole example of EPA's reliance on a disapproved standard. 33 U.S.C. § 1369(b)(1)(F) applies. Approving a TMDL involves issuing a permit. Under the CWA, the review of the decision to issue or deny a permit may be had in the Circuit Court of Appeals. 33 U.S.C. § 1369(b)(1)(F). Thus, I do not have jurisdiction over this issue.

Even if I were to determine jurisdiction exists, the facts here are distinguishable from those in the two cases cited by the American Wildlands, *Whitney v. Booker,* 147 F.3d 1280, 1281 (10th Cir.1998) and *Snyder v. Shalala,* 44 F.3d 896, 897 (10th Cir.1995), both of which involved a contradiction between the substance of the interpretation of the statute and the regulations. Here, there is no such contradiction. Although the statute addresses the issue of when a state's proposed standard will become law, it does not address the status of the standard in the interim sixty days. Accordingly, for the rejected standard to remain in effect as the regulations provide, does not conflict with the statute. In essence, the state proposal becomes effective but does not become the law during the sixty day period when EPA is deciding whether to approve or disapprove the proposed standard. Finally, this issue is most likely moot since the majority of the disapproved standards have been approved and the remaining disapproved standards are presumed to be approved.

Because I do not have jurisdiction to review this issue, I do not rule on it.

### VIII. *Conclusion.*

For the aforesaid reasons, to the extent I have jurisdiction, I affirm EPA's actions. Accordingly.

IT IS ORDERED THAT the relief sought by Plaintiffs is DENIED and this civil action is DISMISSED WITH PREJUDICE, with the parties to pay their own costs.